## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CODI EVANS,

      Plaintiff,

      v.

MARYLAND NATIONAL CAPITAL
PARKS & PLANNING COMMISSION,
CHIEF DARRYL MCSWAIN,
CAPT. MICHAEL MURPHY,
MICHAEL RILEY and
CAPT. DARIN UHRIG,
*in their Individual and Official Capacities,*

      Defendants.

Civil Action No. TDC-19-2651

## MEMORANDUM OPINION

Plaintiff Codi Evans brings this civil action against the Maryland National Capital Parks & Planning Commission ("the MNCPPC"), as well as Chief Darryl McSwain, Director Michael Riley, Captain Michael Murphy, and former Captain Darin Uhrig (collectively, "the Individual Defendants") of the Maryland-National Capital Park Police ("the MNC Park Police"). Evans asserts claims of race discrimination, a hostile work environment, and retaliation arising from his employment as an officer with the MNC Park Police, in violation of federal and state constitutional and statutory provisions, as well as common law claims of negligence. Pending before the Court is Defendants' Motion to Dismiss, which seeks dismissal of all claims. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The MNC Park Police provides protection at parks, buildings, and other areas in Montgomery County and Prince George's County, Maryland under the jurisdiction of the MNCPPC, a bi-county agency established by the Maryland General Assembly.  Plaintiff Codi Evans, an African American man, joined the MNC Park Police in April 1999, was promoted to sergeant on or about June 24, 2013, and was promoted to lieutenant on or about December 8, 2016. After he was promoted to sergeant, Evans was assigned to the Montgomery County Division of the MNC Park Police and was under the command of Defendant Captain Darin Uhrig for some portion of the time from June 2013 until Uhrig's retirement on September 1, 2017.  According to Evans, Uhrig subjected him to unfair and discriminatory treatment.  He alleges that beginning in June 2013, Uhrig spread rumors that Evans did not follow the chain of command; in July 2013, Uhrig denied Evans's request for window tints for his K-9 vehicle and for other equipment while approving similar requests from other officers; and beginning in September 2013, he denied that Evans had a supervisory function in the K-9 unit even though he had one.

Beginning in December 2014, Evans was at various times under the command of Defendant Michael Murphy, a lieutenant who later became a captain, and who, regardless of formal status, operated in a supervisory capacity over Evans until 2019.  Evans alleges that in February 2015, Uhrig and Murphy denied Evans the opportunity to attend a United States Department of Homeland Security ("DHS") explosives training session and instead sent a less qualified officer who was not African American.  In March 2015, Uhrig and Murphy issued to Evans "an unwarranted New Direction Counseling," a form of discipline, after he had requested reimbursement for graduation certificates that he purchased for his K-9 school graduating class.

2

3d Am. Compl. ¶ 17(g), ECF No. 29.  Evans also asserts that while other supervising officers were allowed to report to work 30 minutes before their shifts, he was not.

On March 20, 2015, Evans filed an internal complaint against Uhrig and Murphy relating to their treatment of him.  On March 8, 2016, "an official investigation" sustained six of nine allegations against Uhrig and two of three allegations against Murphy.  Nevertheless, the MNCPPC allowed Uhrig and Murphy to remain on active duty and even temporarily promoted Murphy to an acting captain position.  Moreover, Evans remained under the authority of Uhrig and Murphy even though other officers who complained about unfair treatment by supervisors, including a white-female officer who registered such a complaint in 2019, have been allowed to transfer to a position under a different supervisor.

According to Evans, Uhrig and Murphy, with the assistance of Defendant Michael Riley, a civilian director within the MNC Park Police, retaliated against him for filing his complaint by initiating investigations of him based on allegations they knew to be false.  In April 2018, Murphy filed a complaint against Evans for making fraudulent entries on his time sheets.  Riley then authorized an investigation of Evans.  Evans asserts that although Uhrig was already retired, the MNCPPC allowed him to submit allegations and to "contribute" to the investigation.  *Id.* ¶ 24. The investigation ultimately found only a "single erroneous entry" that had already been corrected. *Id.* ¶ 28.  Nevertheless, Defendant MNC Park Police Chief Darryl McSwain issued a New Direction Counseling against him as discipline.

Then on December 12, 2018, Murphy and Riley initiated an investigation of Evans relating to "Comp K9 leave payouts."  *Id.* ¶ 29.  According to Evans, the MNCPPC again allowed Uhrig to participate in the investigation.  On December 17, 2018, Evans filed a charge of discrimination and retaliation with the United States Equal Employment Opportunity Commission ("EEOC").

3

On February 28, 2019, while working, Evans was hit in the head and experienced a concussion. He was approved for disability leave on March 12, 2019, which lasted a period of ten days. In what Evans alleges to be retaliation for the filing of his EEOC complaint, McSwain issued a "medical suspension" to Evans, which included "stripping" Evans of his badge, firearm, work identification, work laptop computer, and other equipment. According to Evans, MNC Park Police had never issued such a medical suspension to any other employee, nor had it suspended or removed the badges and equipment of other personnel who had not filed EEOC complaints.

Evans further asserts that Uhrig and Murphy "routinely used racial slurs to refer to minority officers," including offensive terms such as "nigger," "monkey," "koon," "ape," "spic," "wet back," and "slant eyes." *Id.* ¶ 37. They also questioned the intelligence of African American police officers and targeted them unfairly. According to Evans, as a result of the "racially hostile work environment" and "unequal terms" and conditions of employment, he has endured "severe mental anguish and emotional suffering, manifesting in physical symptoms including anxiety, stress, anger, and loss of sleep." *Id.* ¶ 55.

Evans filed his original Complaint in this Court on September 11, 2019. In the presently operative Third Amended Complaint ("the Complaint"), Evans alleges statutory claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (2018), 42 U.S.C. § 1981, and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't §§ 20-602 to -611 (West 2014); pursuant to 42 U.S.C. § 1983, federal constitutional claims alleging violations of the First Amendment to the United States Constitution and the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment; state constitutional claims under Articles 24 and 26 of the Maryland Declaration of Rights; and state common law claims of negligence. Specifically, Evans asserts claims of a hostile work environment based on race, in violation of 42

U.S.C § 1981 (Count 1), Title VII (Count 2), and the MFEPA (Count 10); race discrimination, in violation of Title VII (Counts 5 and 9), the Equal Protection Clause (Counts 7 and 8), the MFEPA (Count 10), and the Maryland Declaration of Rights (Count 12); unlawful retaliation, in violation of Title VII (Count 3) and the First Amendment (Count 4); a violation of due process, in violation of the Fourteenth Amendment (Count 6) and the Maryland Declaration of Rights (Count 11); negligent training, retention, and supervision (Count 13); negligence (Count 14); and gross negligence (Count 15).

## DISCUSSION

In their Motion, Defendants assert that: (1) Evans's claims under Title VII, § 1981, and § 1983 are time-barred; (2) Evans has failed to show that Uhrig and Murphy had supervisory authority over Evans as necessary to support the claims against them; and (3) Evans has failed to allege plausible claims for relief on any of his claims.

### I.   Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.    Statute of Limitations

At the outset, Defendants argue that certain claims asserted under Title VII, 42 U.S.C. 1981, and 42 U.S.C. 1983 are time-barred because the events giving rise to those claims occurred outside the relevant statute of limitations.   Ordinarily, "a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).   Thus, a motion to dismissed filed pursuant to Rule 12(b)(6) may challenge a claim as time-barred only in the "relatively rare circumstances" where "all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

### A.    Title VII

Defendants allege that all Title VII claims based on events occurring more than 300 days before Evans filed his charge of discrimination with the EEOC are time-barred.   Before filing suit under Title VII, a plaintiff must first file a charge of discrimination with the EEOC or a "State or local agency with the authority to grant or seek relief" from the discriminatory practice.   42 U.S.C. § 2000e-5(e)(1).   A charge filed with such a state or local agency must be submitted within 300 days of the unlawful employment practice.   *Id.*   The plaintiff cannot recover "for discrete acts of discrimination or retaliation" that occurred outside of this 300-day limitations period.   *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).   A "discrete act" could include a termination, suspension, denial of training, or a false accusation.   *See id.* at 114-15.   However, for a hostile work environment claim, the factual basis for the claim may stretch back farther than 300 days "so long as an act contributing to that hostile work environment takes place" within the 300-

day period. *Id.* at 105; *see also Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007).

Evans filed his charge of discrimination with the EEOC on December 17, 2018. As all parties acknowledge, the relevant limitations period therefore extends back 300 days to February 20, 2018. Thus, for Evans's Title VII discrimination and retaliation claims, only the discrete acts that occurred on or after February 20, 2018 may support timely claims. Accordingly, Evans's Title VII claims based on the April 2018 and December 2018 investigations, the resulting New Direction Counseling, and the March 2019 medical suspension are timely. To the extent that Evans seeks to assert a Title VII discrimination or retaliation claim based on an earlier incident, such as the 2013 denial of his request for window tints, such a claim would be time-barred. However, contrary to Defendants' claim, the "facts" relating to incidents occurring before February 20, 2018 are not time-barred. Mot. Dismiss at 4, ECF No. 38-1. Such incidents may provide relevant evidence on Evans's timely discrimination and retaliation claims, such as to show discriminatory or retaliatory intent, and thus remain as background facts that may be the subject of discovery and evidence presented at trial. *Morgan*, 536 U.S. at 113 (stating that Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim").

The Title VII hostile work environment claim is also timely because Evans has alleged that the 2018 investigations were part of an ongoing hostile work environment that continued into the 300-day limitations period. *See id.* at 105. On this claim, Evans may rely on acts that occurred before February 20, 2018 and contributed to the same, ongoing hostile work environment. *See id.* at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability").

7

**B.     42 U.S.C. § 1981**

Evans's claim under 42 U.S.C. 1981 is limited to a hostile work environment claim against the Individual Defendants.  A four-year statute of limitations applies to § 1981 claims occurring after the formation of an employment contract, including hostile work environment claims.  *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004).  As with a Title VII hostile work environment claim, if one act contributing to a § 1981 hostile work claim occurred within the limitations period, the claim is timely, even if other acts that contributed to the hostile work environment occurred outside the limitations period.  *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 223-24 (4th Cir. 2016) (adopting the application of the "continuing violation" theory to § 1981 hostile work environment claims).

Because Evans filed the original Complaint on September 11, 2019, his § 1981 claim is timely if any act that contributed to the hostile work environment occurred on or after September 11, 2015.  The 2018 investigations, the subsequent New Discipline Counseling, and the March 2019 medical suspension all occurred after that date and have been plausibly alleged to have contributed to an ongoing a hostile work environment.  The § 1981 hostile work environment claim is therefore timely.

**C.     42 U.S.C. § 1983**

42 U.S.C. § 1983, the statute underlying Evans's federal constitutional claims, does not contain its own statute of limitations, so courts must import the statute of limitations from the most analogous state law cause of action.  *Owens v. Balt. City State's Atty's Off.*, 767 F.3d 379, 388 (4th Cir. 2014).  All the events in this case occurred in Maryland.  Consequently, Maryland's three-year statute of limitations for civil actions, Md. Code Ann., Cts. & Jud. Proc. § 5-101 (LexisNexis 2020), applies to these claims.  *Owens*, 767 F.3d at 388.  Although state law provides the

8

limitations period for such claims, federal law controls when those claims accrue. *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995). Under federal law, a "cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Id.*

Because Evans filed this suit on September 11, 2019, his constitutional claims under § 1983 are timely if they are based on violations that occurred on or after September 11, 2016. Thus, any constitutional claims based on the April 2018 and December 2018 investigations, the resulting New Direction Counseling, and the March 2019 suspension are timely. To the extent that Evans seeks to assert constitutional claims pursuant to § 1983 based on discrete acts of discrimination or retaliation occurring before September 11, 2016, such claims are time-barred. Acts that occurred before September 11, 2016, however, remain relevant to the assessment of Evans's remaining claims.

## III.    Hostile Work Environment

Defendants argue that Evans has not stated a plausible hostile work environment claim. Evans asserts analogous hostile work environment claims against the MNCPPC under Title VII (Count 2) and the MFEPA (Count 10) and against the Individual Defendants under § 1981 (Count 1). The standards for a Title VII hostile work environment claim also apply to a hostile work environment claim under § 1981. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). Likewise, because Maryland courts interpreting the MFEPA generally rely on Title VII precedent, and neither party argues that a different standard should apply, the Court will evaluate the MFEPA hostile work environment claim together with, and pursuant to the same standards as, the Title VII claim. *See Taylor v. Giant of Maryland*, LLC, 33 A.3d 445, 459 (Md. 2011) (stating

9

that Maryland courts have a "history of consulting federal precedent in the equal employment area"); *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 & n.8 (Md. 2007) (stating that "Title VII is the federal analog to Art. 49B of the Maryland Code," the previous statutory citation for Maryland's employment discrimination statute, and that "our courts traditionally seek guidance from federal cases in interpreting Maryland's Article 49B").

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). Defendants challenge the sufficiency of the allegations as to each element.

**A.      Unwelcome Conduct**

Evans's allegations fulfill the requirement of "unwelcome conduct." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir.2011). Evans alleges that Uhrig and Murphy perpetrated a multi-year series of unwelcome acts that culminated in their participation in two allegedly frivolous investigations against him. The alleged harassment included spreading rumors and falsehoods about Evans's insubordination and lack of supervisory authority, denials of his requests for equipment and training made available to others, a New Direction Counseling disciplinary measure, and unwarranted scrutiny of Evans's time sheets and leave requests. Evans's decision to file an internal complaint based on this conduct demonstrates that it was unwelcome. Likewise,

after Uhrig and Murphy allegedly participated in two baseless, harassing 2018 investigations into Evans, one of which culminated in another New Direction Counseling disciplinary measure, Evans decided to file a charge of discrimination with the EEOC. Finally, the allegedly unprecedented 2019 medical suspension, which Evans alleges humiliated him when his badge and gun were taken away, provides another example of unwelcome conduct.

## B.    Based on Race

Evans has also provided sufficient allegations to support a plausible inference that the harassment was based on race. *See Boyer-Liberto*, 786 F.3d at 277. First, Evans alleges that Uhrig and Murphy routinely used racial slurs and stereotypes when discussing African American officers and questioned their intelligence. *See id.* at 279-80 (finding that the use of racial slurs supported a finding of a hostile work environment based on race); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (finding that the use of frequent religious slurs supported a claim of a hostile work environment based on religion). Even without specific allegations connecting such racially hostile language to specific incidents of unwelcome conduct, the assertion that Uhrig and Murphy routinely used such language in the workplace both supports the inference that the unwelcome conduct directed at Evans was based on racial animus and itself provides additional evidence of a racially charged hostile work environment. *See Strothers v. City of Laurel*, 895 F.3d 317, 330-31 (4th Cir. 2018) (stating that "harassment need not be accompanied by a contemporaneous statement of animus to be actionable under Title VII" and that "the connection between animus and conduct may be inferred from the totality of the circumstances"). Second, he alleges that similarly situated white officers were not subjected to the type of unwelcome conduct he endured and identifies specific instances in which he received such disparate treatment, including when he was denied DHS explosives training that a less qualified, non-African American

11

officer was allowed to attend. *See id.* at 330 (finding that "disparate treatment" supported an inference of racial animus). Third, Evans alleges that he filed an internal complaint regarding race discrimination by Uhrig and Murphy, which resulted in a year-long investigation that resulted in the MNCPPC sustaining 8 of his 12 complaints. Finally, where Uhrig and Murphy were the subject of that internal inquiry relating to race discrimination, their participation in the harassing 2018 investigations of Evans can be reasonably viewed as additional acts taken based on racial animus. The allegations therefore support Evans's assertion that Uhrig and Murphy targeted him because of his race.

### C.    Severe or Pervasive

As for whether the harassment was sufficiently "severe and pervasive" to alter the conditions of employment and create an abusive atmosphere, this element has both subjective and objective components. *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). First, the plaintiff must have subjectively perceived the environment to be hostile or abusive. *Id.* Where Evans filed an internal complaint about the harassment and has alleged that it caused him emotional distress, including "anxiety, stress, anger and loss of sleep," 3d. Am. Compl. ¶ 55, he has satisfied this requirement. *See Cent. Wholesalers, Inc.*, 573 F.3d at 176 (finding that a plaintiff's emotional distress and complaints to supervisors met the subjective component).

In assessing whether the environment "was objectively severe or pervasive," courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315). No "single factor is dispositive" because the "real social impact of

12

workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* (citations omitted).

In *Strothers v. City of Laurel*, 895 F.3d 317 (4th Cir. 2018), a supervisor consistently scrutinized the performance of the African American plaintiff by noting every time she arrived late for work, even by minutes; required notice whenever she left her desk, even to use the bathroom; imposed a start time different from what the plaintiff had agreed to when she accepted the position; and berated her for wearing pants that the supervisor claimed were in violation of the casual Friday dress code, when there was no history of strict enforcement of the dress code against others. *Id.* at 324-25, 331-32. The supervisor cited tardiness and the dress code issue in giving a negative performance evaluation, and the plaintiff eventually felt compelled to submit a detailed memorandum to her supervisor defending herself. *Id.* at 325-26. The court found these acts supported a finding of an objective hostile environment because "[h]eightened scrutiny" and "unfair evaluations" can "make a job more difficult and trigger responses from workers who feel compelled to protest their treatment, which may further interfere with their work." *Id.* at 332. As in *Strothers*, Evans alleges that Uhrig and Murphy consistently scrutinized his time and leave and interfered with his start time by prohibiting him from reporting 30 minutes before his shifted started even though other officers were permitted to do so, presumably to increase their pay. This course of conduct similarly forced him to protest his treatment by filing an internal complaint. The subsequent, allegedly frivolous 2018 investigations into Evans's time sheets and leave payouts subjected Evans to further heightened scrutiny and unfair evaluation. Beyond these issues, Evans was, like the plaintiff in *Strothers*, subjected to discriminatory enforcement of rules, in that he was denied equipment and window tints made available to other officers. He was also subjected to "intimidation, ridicule, and insult" when he was made the subject of rumors about insubordination

and false statements that refused to recognize his supervisory role, and when he was given an unprecedented medical suspension that forced him to give up his badge and gun. *Boyer-Liberto*, 786 F.3d at 277.

Finally, the alleged repeated use of highly offensive racial slurs and questioning of the intelligence of African American officers bolster the conclusion that the alleged harassment was severe and pervasive. *See Boyer-Liberto*, 786 F.3d at 280 (finding two uses of a severe racial epithet sufficient to support a hostile work environment claim). Such slurs may contribute to a hostile work environment even when they are not directed at, or even delivered in the presence of, the plaintiff. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 333 (4th Cir. 2011) (noting that the "totality of the circumstances," including conduct directed against others, may be considered in evaluating a plaintiff's hostile work environment claim); *Sunbelt Rentals, Inc.*, 521 F.3d at 317 (noting that "comments made to others," which included slurs reported by customers without evidence that the plaintiff was present at the time, are relevant in assessing a hostile work environment claim); *cf. Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 696 (4th Cir. 2007) (stating that in assessing whether sexual harassment is severe and pervasive, "[e]vidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances"). Thus, even if not directed at Evans, the allegation of the regular use of racial slurs and stereotyping by Uhrig and Murphy further supports a reasonable inference of objectively severe or pervasive harassment.

Taken together, these allegations support a plausible inference that Evans was subjected to harassment sufficiently severe and pervasive that it created an abusive environment and unreasonably interfered with his work performance.

### D.      Imputable to the Employer

The final requirement is that the harassment be imputable to the employer.  Under Title

VII, liability is imputed to an employer in two circumstances.  First, if the harasser is the victim's

supervisor, the employer is strictly liable.  *Strothers*, 895 F.3d at 333.  A supervisor is someone

empowered to "effect a significant change in employment status," such as firing, promotion, or "a

decision causing a significant change in benefits."  *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S.

421, 424 (2013)).  Second, if the harasser is the victim's co-worker, the employer may be liable if

it "knew or should have known about the harassment and failed to take effective action to stop it."

*Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc).

Here, Defendants dispute that Uhrig and Murphy were Evans's supervisors at the time of

the harassment.  Evans, however, alleges that several incidents of alleged harassment occurred

while he was subject to their "command," and these incidents illustrate that Uhrig and Murphy had

the ability to issue certain forms of discipline and to make decisions affecting his daily work, such

as whether he had access to certain equipment and whether he could receive certain training.  3d

Am. Compl. ¶ 17.  Though it may not be entirely clear whether, by having Evans under their

command, Uhrig and Murphy could make decisions on changes in his employment status, their

conduct was plainly imputable to the MNCPPC because Evans actually reported several instances

of their harassment in an internal complaint, and the MNCPPC not only failed to stop the conduct,

but also allowed them to remain in a position to further harass Evans.  Significantly, by the time

of the 2018 investigations, when the MNCPPC knew or should have known about their race-based

harassment, Riley nevertheless participated in the investigations, and McSwain ordered the

medical suspension.  Where Defendants do not dispute that both Riley and McSwain were higher

level supervisors to Evans, their conduct was also imputable to the employer.  Viewing the

15

allegations in the light most favorable to Evans, they are sufficient to support a claim both that the Individual Defendants conducted the harassment or were aware of it and failed to take effective action to stop it, and that their conduct was imputable to the employer. *See Ocheltree*, 335 F.3d at 334. As to the § 1981 claim, it is not even necessary to establish that Uhrig and Murphy were Evans's supervisors in order to establish liability against them. *See, e.g., Al-Khazraji v. St. Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986).

Evans has therefore alleged a plausible hostile work environment claim under Title VII, § 1981, and the MFEPA. The Court will deny the Motion as to these claims.

## IV. Race Discrimination

In six different counts, Evans alleges race discrimination consisting of disparate treatment as compared to similarly situated white MNC Park Police officers. Counts 5 and 9 both assert this claim under Title VII and are duplicative. Count 10 asserts the same claim under the MFEPA.

Counts 7 and 8 both assert the same or similar claims under 42 U.S.C. § 1983. Section 1983 provides that a person who "under color of" law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. Where the MNCPPC is a governmental entity and the Individual Defendants were government officials, Evans may assert a claim of employment discrimination under § 1983 against the Individual Defendants. *Beardsley v. Webb*, 30 F.3d 524, 527 (4th Cir. 1994). A § 1983 claim must identify the constitutional or statutory right that has been allegedly violated by a state official. Evans, however, does not explicitly identify the specific right at issue for either claim and instead references only "equal protection" as to Count 7 and "disparate treatment" as to Count 8. 3d Am. Compl. at 24-25. Because § 1983 employment discrimination

claims are typically based on an alleged violation of the Fourteenth Amendment right to equal protection of the law, and both of these terms are consistent with such a claim, the Court will construe both as asserting such a federal constitutional claim.[1]   U.S. Const. amend. XIV, § 1. Finally, in Count 12, Evans asserts a state constitutional claim of race discrimination in violation of the Maryland Declaration of Rights.

### A.    Statutory Claims

Title VII standards also apply to employment discrimination claims under the MFEPA. *See Taylor*, 33 A.3d at 459; *Haas*, 914 A.2d 735, 742 & nn.8-9.  As the parties agree that Title VII analysis and precedent apply to claims under the MFEPA, the Court will assess these claims together under Title VII standards.

To establish a Title VII claim for race discrimination based on disparate treatment, a plaintiff may provide direct evidence of discriminatory intent or may seek to prove the claim through the burden-shifting analysis outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011).  Under this approach, the burden is first on the plaintiff to establish a *prima facie* case of discrimination.  *Id.*  Upon such a showing, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct.  *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)).  If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons for its actions were not the true reasons and were a "pretext for discrimination."  *Id.* at 558-59 (quoting *Hill*, 354 F.3d at 285).

---

[1]   In any event, to the extent that the reference to "disparate treatment" was intended to reference a federal statutory right, the applicable statute would be Title VII, and the analysis would mirror the Court's analysis of the Title VII claim.

To establish a *prima facie* claim for discrimination based on disparate treatment, a plaintiff must present facts demonstrating:  (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White*, 375 F.3d at 295. While Defendants dispute the third and fourth elements, the Court addresses only the third element because it proves dispositive.

"An adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)).  Examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

Within the Title VII limitations period starting on February 20, 2018, Evans has not alleged any discrete acts that could constitute an adverse employment action.  First, Evans references the two 2018 investigations into his time sheets and leave payout.  Although Evans alleges these caused him "anxiety, stress, anger, and loss of sleep," 3d Am. Compl. ¶ 55, he does not show how the investigations adversely affected the terms, conditions, or benefits of his employment.  For example, he does not allege that the investigations led to a reduction in his pay, his job title, or his opportunities for promotion.  Such investigations, without more, do not constitute adverse employment actions. *See Hoffman v. Balt. Police Dep't*, 379 F. Supp. 2d 778, 792 (D. Md. 2005) (dismissing a disparate treatment claim where the plaintiff alleged an investigation but did not allege that it caused any further employment injury because "[t]he few courts that have considered whether an investigation, *by itself*, can constitute an adverse employment action have answered

18

that question in the negative"); *Settle v. Balt. Cty.*, 34 F. Supp. 2d 969, 992 (D. Md. 1999) (finding that an "investigation" must have "actually adversely affected some term or condition of employment" to support a disparate treatment claim), *aff'd sub nom. Settle v. Balt. Cty. Police Dep't*, 203 F.3d 822 (4th Cir. 2000).

Second, Evans has alleged that after the April 2018 investigation of his time sheets, he received a "disciplinary measure" known as a "New Direction Counseling." 3d. Am. Compl. ¶¶ 17(g), 28. Although certain forms of discipline may affect the terms and conditions of employment, Evans has not described the nature of this disciplinary measure and has not explained how it adversely affected his employment. *See Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 755 (4th Cir. 1996) (holding that a formal disciplinary warning, which was subsequently removed from an employee's personnel record, was not an adverse action); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) (holding that a formal, written reprimand that, by policy, remains in an official personnel file for two years but does "no tangible harm" to the terms or conditions of employment does not qualify as an adverse employment action); *see also Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (stating that "reprimands . . . occur with some frequency in the workplace" and thus are "much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent"). As a result, the alleged disciplinary action with unspecified consequences does not rise to the level of an adverse employment action.

Third, Evans alleges that he received a "medical suspension" in March 2019. 3d Am. Compl. ¶ 35. Suspension without pay may constitute an adverse employment action. *See, e.g., Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2007) ("[A] suspension without pay . . . would constitute an adverse employment action."); *see also Greer v. Paulson*, 505 F.3d 1306,

19

1317-18 (D.C. Cir. 2007) (in finding that placement on absent-without-leave and leave-without-pay status could constitute an adverse employment action for purposes of race discrimination, noting that "a suspension without pay" could be materially adverse to the employee). Evans, however, does not allege that he was suspended without pay. Indeed, Evans asserts only that McSwain stripped him of his firearm, badge, and certain work equipment during the "medical suspension." 3d Am. Compl. ¶ 35. He does not allege that these items were withheld from him when the medical suspension ended. Where Evans has not alleged an impact on his pay, job title, or other terms and conditions of employment, the temporary loss of equipment during a time period in which Evans was not expected to be working because of a disability, even if humiliating to Evans, did not constitute an adverse employment action for purposes of a Title VII discrimination claim.

Fourth, for the same reasons, none of the earlier alleged incidents of discriminatory conduct, such as the denial of window tints and a training opportunity, qualify as adverse employment actions. Relatedly, without specifying dates, Evans argues that the use of racial slurs and derogatory language itself constituted actionable race discrimination. Although such discriminatory treatment provides compelling evidence of racial animus, an actionable Title VII claim must still be grounded in an adverse employment action. *See Boyer-Liberto*, 786 F.3d at 277 ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir. 1997) ("[N]ot every insult, slight, or unpleasantness gives rise to a valid Title VII claim."), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Finally, Evans generally asserts that the discriminatory treatment he suffered has "cast a pall over [his] career, impacting his advancement and earnings opportunities." 3d Am. Compl. ¶ 39. He does not, however, explain how any particular act or group of acts reduced his pay or impeded his career progression.  Nor does he identify similarly situated white officers whose incomes increased or whose careers advanced more rapidly because they did not face the specific investigations, discipline, and medical suspension that he endured.  Without more, Evans's general allegation that his "advancement and earnings opportunities" were adversely impacted is insufficient to support an inference that the allegedly discriminatory actions he faced from February 2018 forward, individually or collectively, established an adverse employment action.

Because Evans has not alleged an adverse employment action for purposes of a Title VII claim, Evans has not stated a *prima facie* case of race discrimination based on disparate treatment under Title VII.  The Court will grant Defendants' Motion as to the Title VII and MFEPA race discrimination claims in Counts 5, 9, and 10.

### B.    Constitutional Claims

As for the federal and state constitutional claims, Article 24 of the Maryland Declaration of Rights, invoked in Count 12, is generally "interpreted *in pari materia* with the Fourteenth Amendment," though the two "are independent and capable of divergent effect." *Tyler v. City of Coll. Park*, 3 A.3d 421, 435 (Md. 2010). Nevertheless, the parties agree that the equal protection analysis proceeds in the same manner under both the federal and state constitutional provisions, so the Court addresses both claims together pursuant to federal constitutional analysis.

The parties also agree that the analysis of these claims tracks the Title VII analysis. The United States Court of Appeals for the Fourth Circuit has stated that "the elements required to establish" a discrimination claim are "the same" under Title VII and § 1983, *Love-Lane v. Martin*,

355 F.3d 766, 786 (4th Cir. 2004), and it has repeatedly applied the *McDonnell Douglas* Title VII framework when assessing § 1983 employment discrimination claims, including claims specifically asserting violations of the Equal Protection Clause. *Id.*; *Beardsley*, 30 F.3d at 529 (applying Title VII analysis to a § 1983 claim of harassment and discrimination based on sex in violation of the Fourteenth Amendment); *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1288 (4th Cir. 1985). Defendants take the view that the Title VII analysis applies to the equal protection claims, and Evans does not dispute this position. Rather, in discussing the equal protection claims, Evans applied Title VII analysis by asserting that he "detailed numerous adverse employment actions, and pled causal links between the adverse employment actions and the protected activities." Opp'n at 40, ECF No. 42. Where neither side contests the standard, the Court "shall assume that the *McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993).

Evans's equal protection claims fail for the same reason that his Title VII race discrimination claim fails. As discussed above, Evans has not pleaded facts supporting a finding of an actionable adverse employment action, including during the applicable limitations period, which extends back to September 11, 2016. *See supra* part IV.A. The Court will therefore grant Defendants' Motion as to Counts 7, 8, and 12.

## V.      Retaliation

Defendants also argue that the retaliation claims under Title VII (Count 3) and the First Amendment (Count 4) should be dismissed because Evans has failed to state a plausible claim for relief.

22

## A.     Title VII

Under Title VII, it is unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3.

A Title VII retaliation claim may be established through direct evidence of retaliatory intent or through the following burden-shifting framework:

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation. Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted).

To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer-Liberto*, 786 F.3d at 281. For a retaliation claim, a "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Evans has alleged facts sufficient to support a *prima facie* case of retaliation.

First, Evans engaged in two protected activities. In 2015, he filed an internal complaint about race discrimination by Uhrig and Murphy with the MNCPPC. In 2018, he filed an EEOC charge of discrimination. There is no dispute that Evans's EEOC charge constituted protected activity. Evans's internal complaint also constituted protected activity. *See Strothers*, 895 F.3d at 336 (concluding that an internal memorandum complaining to a supervisor about harassment constituted protected activity even if it did not explicitly reference race discrimination).

Second, the MNCPPC took materially adverse actions against Evans following each protected activity. After Evans submitted his internal complaint, the MNCPPC undertook two allegedly frivolous investigations of Evans. First, after Murphy filed a complaint in April 2018 against Evans accusing him of fraudulent entries on his time sheets, Riley authorized an investigation into the matter. Although only a single erroneous entry was found, Evans received discipline from McSwain in the form of a New Direction Counseling. Then, in December 2018, Murphy and Riley launched an allegedly frivolous investigation into Evans's leave payouts. To be the subject of such allegedly baseless and harassing internal investigations might well "dissuade[] a reasonable worker from making or supporting a charge of discrimination," particularly when discipline could follow. *Burlington N*, 548 U.S. at 68. Similarly, after Evans filed his EEOC charge in December 2018, McSwain placed him on an unprecedented medical suspension and required him to surrender his firearm, badge, and work equipment in humiliating fashion. Viewed in the light most favorable to Evans, a suspension of this type, particularly when accompanied by the humiliation of returning one's firearm and badge, also might dissuade a reasonable employee from making a charge of discrimination. *See id.* at 68. Thus, Evans has plausibly alleged materially adverse actions that satisfy the second element of a Title VII retaliation claim.

Third, Evans has adequately alleged causation. At the *prima facie* stage, this is "not an onerous burden." *Strothers*, 895 F.3d at 335. Indeed, an employee may establish causation by showing that the employer knew of the employee's protected activity and took a materially adverse action soon after. *Id.* at 336. Evans's March 2019 medical suspension meets this standard because it occurred three months after his December 2018 EEOC charge. *See, e.g., Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (discussing cases finding causation when the adverse actions occurred

24

four and six months after the protected conduct). The allegations also support an inference of causation between Evans's internal complaint and the 2018 investigations requirement. Although the 2018 investigations occurred approximately two years after the MNCPPC partially sustained Evans's internal complaint in March 2016, temporal proximity is merely sufficient for causation, not necessary. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (noting that "evidence of recurring retaliatory animus" can establish causation even in the absence of temporal proximity). Here, Evans has alleged a continuum of hostile activity against him over a period of multiple years that includes another incident of alleged retaliation, the medical suspension, that occurred soon after protected activity and within a year of the 2018 investigations. Moreover, the facts that Uhrig, one of the officials who was the subject of Evans's internal complaint, was allowed to participate in the investigations even though he was retired, and that the first investigation found only a single, already corrected error and still resulted in discipline, raise concerns about the legitimacy of the investigations and thus reinforce the inference that the investigations were a form of retaliation for the internal complaint. Viewed in the light most favorable to Evans, the allegations meet the causation prong of a *prima facie* case. Evans has therefore alleged facts sufficient to state a claim for retaliation under Title VII.

### B.     First Amendment

Defendants also seek dismissal of Evans's related First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983. To state a claim for retaliation under the First Amendment, a plaintiff must plausibly allege that: (1) that the plaintiff engaged in constitutionally "protected" speech; (2) "that the defendant's alleged retaliatory conduct adversely affected the plaintiff's constitutionally protected speech"; and (3) that there was "a causal relationship between [the] speech and the defendant's retaliatory action." *Blankenship v. Manchin*, 471 F.3d 523, 528 (4th

Cir. 2006). In the context of a claim by a public employee against a public employer, the requirement of protected speech is met if the plaintiff was speaking as a citizen "on a matter of public concern" rather than as an employee on a matter of personal interest, and if the employee's interest in speaking on that matter outweighed the government's interest in providing effective and efficient services to the public. *See Ridpath v. Bd. of Governors*, 447 F.3d 292, 316 (4th Cir. 2006); *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998). Even if a public employee's speech relates to the employee's job or communicates information learned on the job, the speech may still be protected by the First Amendment when it is made outside the normal course of the employee's duties. *See Hunter v. Town of Mocksville*, 789 F.3d 389, 396-97 (4th Cir. 2015); *see also Lane v. Anderson*, 660 F. App'x 185, 191 (4th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), and *Hunter*, 789 F.3d at 396-97).

On the first prong, Defendants argue that Evans's speech was not protected because it did not involve a matter of public concern. Evans alleges two instances of protected speech: his 2015 internal complaint regarding race discrimination by Uhrig and Murphy, and his 2018 EEOC charge of discrimination. Speech relating to race discrimination in a law enforcement agency may qualify as speech on a matter of public concern. *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996). In *Cromer*, an African American deputy sheriff was fired after he signed a private letter sent by a group of law enforcement officers to the sheriff alleging race discrimination at the sheriff's office. *Id.* at 1325. In finding that the signing of the letter constituted protected speech, the Fourth Circuit recognized that allegations "about racial discrimination within a law enforcement agency" "are matters of serious public import" and noted that "[p]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly." *Id.* at 1325-26, 1329; *see also Leonard v. City of Columbus*, 705

F.2d 1299, 1305 (11th Cir. 1983) (holding that allegations of race discrimination within a police force constituted "matters of interest to the community-at large," not merely "internal police matters"); *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir. 1988) (finding that a state police employee's statement to a reporter that she was a victim of retaliation arising out of racial animus within the state police was protected speech on "a matter of grave public concern" in light of a history of litigation against the state police relating to race discrimination).

The Fourth Circuit, however, has distinguished between complaints about broad discrimination in a public workplace and individual, internal complaints about discriminatory treatment. *See Brooks v. Arthur*, 685 F.3d 367, 372-73 (4th Cir. 2012). In *Brooks*, the court, while acknowledging that "discriminatory institutional policies or practices can undoubtedly be a matter of public concern," concluded that an African American employee of a state prison system whose internal complaint of discrimination related only to his individual mistreatment did not have a valid First Amendment retaliation claim because an employee "who seeks primarily resolution of his personal situation through an employer-provided grievance process simply does not speak with the civic intent necessary to invoke the First Amendment." *Id.* at 369-70, 373. In so ruling, the court acknowledged that an individual complaint of discrimination can qualify as raising a matter of public concern, such as if it raises issues about a "practice within [a] department" or conduct that could "imperil[] the public welfare." *Id.* at 372, 374-75. For example, in *Campbell v. Galloway*, 483 F.3d 258 (4th Cir. 2007), the Fourth Circuit found that a police officer's internal complaint of sexual harassment related to a matter of public concern where the plaintiff asserted that male officers did not back her up on dangerous calls, an issue that could implicate public safety, and that the alleged harassment extended broadly to other female officers in the police department and even to female members of the public. *Id.* at 269-70; *Brooks*, 685 F.3d at 374-75

27

(discussing *Campbell*). Here, however, Evans's discussion in the Complaint of his 2015 internal complaint references only specific incidents of mistreatment that he personally endured at the hands of Uhrig or Murphy, and he does not allege that his 2018 EEOC charge of discrimination identified issues beyond his own personal claims of disparate treatment. Where Evans has not alleged that his 2015 and 2018 complaints extended beyond asserting disparate treatment and retaliation against him, he has not stated facts sufficient to support a plausible claim that these complaints related to a "matter of public concern" rather than a "personal grievance." *Brooks*, 685 F.3d at 373, 375. The Court will therefore grant the Motion as to the First Amendment retaliation claim in Count 4 and need not address the remaining arguments relating to this claim.

## VI.    Due Process

Defendants further assert that Evans has failed to state plausible claims that they violated his rights to due process of law under the Fourteenth Amendment to the United States Constitution (Count 6) and Article 24 of the Maryland Declaration of Rights (Count 11). The parties acknowledge that Maryland courts often rely on federal due process analysis in resolving analogous state constitutional due process claims, so this Court will apply federal analysis to both due process claims. *See, e.g., Roberts v. Total Health Care, Inc.*, 709 A.2d 142, 146-47 (Md. 1998).

### A.    Procedural Due Process

Defendants assert that Evans has failed to state a plausible claim of a procedural due process violation. Other than stating that "[t]here are no adequate procedural safeguards in place," 3d Am. Compl. ¶ 116, Evans makes no reference in the Complaint that arguably relates to a violation of procedural due process. Even assuming that Evans intended to include a procedural due process claim, where Evans has failed to oppose Defendants' argument on this issue in his

memorandum in opposition to the Motion, he has abandoned any such claim. *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that the plaintiff had abandoned a claim "by failing to address that claim in her opposition to [the defendant's] motion" or "to offer clarification in response to [the defendant's] reply brief"). In any event, any procedural due process claim would be dismissed because in the public employment context, the first step of the procedural due process inquiry is to assess whether the plaintiff has been deprived of a protected property interest in continued public employment, and Evans has failed to allege any property interest in his position. *See Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009).

### B.    Substantive Due Process

Evans's due process claim is better characterized as a substantive due process claim. Substantive due process prevents "government officials from abusing their power" with conduct that is "arbitrary" or "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). "[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8. If it meets this standard, the next step is to assess whether the conduct violates a liberty interest held by the plaintiff. *See Hawkins v. Freeman*, 195 F.3d 732, 738-39 (4th Cir. 1999) (stating that if an executive act does not shock the conscience, then there is "no need to inquire into the nature of the asserted liberty interest"). In "the voluntary employment context," a plaintiff must allege intentional harm, not mere deliberate indifference. *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 322 (4th Cir. 2012).

Here, Evans alleges that Defendants intended to harm him through acts including repeated use of racial slurs, baseless and harassing investigations, unwarranted discipline, and a medical suspension. He argues that these actions violated his substantive due process right "to be free from

29

arbitrary racial discrimination." Opp'n at 38. Courts have found that intentional race discrimination may give rise to a substantive due process violation. *See MARJAC, LLC v. Trenk*, 380 F. App'x 142, 147 (3d Cir. 2010) ("Depending on the gravity, context, and surrounding circumstances, selective enforcement motivated by ethnic bias may constitute arbitrary conduct capable of shocking the conscience."); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 327 (D. Md. 2018) (stating that "[s]ubstantive due process has long encompassed racial discrimination" and finding that the plaintiffs plausibly alleged that an attempt to end an immigration program violated substantive due process where it stemmed from "anti-Latino animus"). Although Defendants assert that there is no "liberty right to be secure in one's person," Mot. Dismiss at 25, Evans has clarified, and the Complaint can fairly be read to assert, that the liberty interest at stake is to be free from race discrimination. Given that race discrimination may shock the conscience and Defendants have not demonstrated that Evan's asserted liberty interest is not valid, the Court will deny the Motion as to the substantive due process theory under Counts 6 and 11.

Finally, Defendants have argued that Uhrig generally cannot be held liable on § 1983 claims because he retired in September 2017 and such claims do not apply to private conduct. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). However, where Uhrig was undisputedly a government official during some portion of the relevant limitations period, *see supra* part II.C, and Evans has alleged that even after his retirement Uhrig was engaging in discrimination and retaliation in concert with state officials by contributing to the investigations against Evans, the Court will not dismiss the claim against Uhrig at this early stage of the case. *See Gregg v. Ham*, 678 F.3d 333, 339 n.3 (4th Cir. 2012) (stating that a private party may be considered a state actor if the deprivation of a right is caused by the exercise of a right created by

the State, and if the private individual may be "fairly said to be a state actor," such as when that individual "has acted together with or has obtained significant aid from state officials"); *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (stating that "apparently private" actions may be treated as actions of the State if they "have a sufficiently close nexus with the State").

## VII.   Negligence

Evans alleges three counts grounded in common law negligence. In Count 13, he alleges that the MNCPPC is liable for negligent training, retention, or supervision ("negligent supervision"). In Counts 14 and 15, Evans asserts claims of negligence and gross negligence, respectively, against all Defendants. Defendants argue that these claims should be dismissed because Maryland law precludes such claims, and that the negligent supervision claim fails because the MNCPPC was not aware of its employees' misconduct.

Contrary to Defendants' argument, the Court of Appeals of Maryland has held that statutes such as Title VII and the Maryland Workers' Compensation Act do not bar an employee from bringing a negligent retention claim based on the "intentional and unlawful misconduct of a fellow employee." *Ruffin Hotel Corp. of Md. v. Gasper*, 17 A.3d 676, 689 (Md. 2011). Defendants' reliance on *Crosten v. Kamauf*, 932 F. Supp. 676 (D. Md. 1996), is therefore misplaced. *Croston* relied on *Maxey v. M.H.M. Inc.*, 828 F. Supp. 376 (D. Md. 1993), a case which predates *Ruffin* and in any event relied on an imperfect analogy to the principle that a common law abusive discharge claim may be brought only when the termination violates a clear mandate of public policy not grounded in statute. *Id.* at 378 (citing *Watson v. Peoples Sec. Life Ins. Co.*, 588 A.2d 760, 769 (Md. 1991)). While an abusive discharge claim has as an element such a violation of public policy, a negligence claim does not.

31

As for the claim that the MNCPPC was unaware of any misconduct by its personnel, as discussed in relation to the hostile work environment claims, *see supra* part III, the MNCPPC was on notice of discriminatory misconduct by Uhrig and Murphy from Evans's internal complaint in 2015, for which the majority of the allegations were sustained.

Although Evans's negligence causes of action may not be the most typical claims asserted in the context of employment discrimination, they are not unprecedented. *See Penhollow v. Bd. of Comm'rs for Cecil Cty.*, 695 A.2d 1268, 1283-85 (Md. Ct. Spec. App. 1997) (affirming a grant of summary judgment based on immunity but not challenging the cause of action where a plaintiff's negligent hiring claim against her government employer stemmed from discrimination by other employees). Where Defendants have offered no other theories for dismissal of these claims, the Motion will be denied as to the negligence claims in Counts 13, 14, and 15.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. A separate Order shall issue.

Date:   November 13, 2020

THEODORE D. CHUANG
United States District Judge