# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CODI EVANS,                           *

Plaintiff,                            *

v.                                    *           Civil Action  MJM-19-2651

MARYLAND-NATIONAL CAPITAL             *           <u>UNDER SEAL</u>
PARKS & PLANNING COMMISSION, *et al*.,
                                      *
Defendants.

                                      *

* * * * * * * * * * *

## <u>MEMORANDUM OPINION</u>

Codi Evans ("Plaintiff") commenced this civil action against his employer, the Maryland-National Capital Parks & Planning Commission (the "MNCPPC" or the "Commission"), as well as Chief Darryl McSwain, Captain Michael Murphy, Michael Riley, and Captain Darin Uhrig (collectively, the "Individual Defendants" and, with MNCPPC, "Defendants") of the Maryland-National Capital Park Police (the "Park Police").[1] Plaintiff asserts claims of a hostile work environment, retaliation, and due process violations arising from his employment as an officer with the Park Police, as well as common law claims of negligence.

Now pending is Defendants' Joint Motion for Summary Judgment. (ECF 106). Plaintiff filed a memorandum in opposition to the motion (ECF 128, 140), and Defendants filed a reply memorandum (ECF 132). Additionally, with the Court's permission, Plaintiff

---

[1]      Uhrig retired from the Maryland-National Capital Park Police on August 31, 2017. (Uhrig Aff. ¶ 1). Murphy retired from the Maryland-National Capital Park Police on May 1, 2021. (Murphy Def. 6:16–20).

filed a sur-reply (ECF 138), and Defendants a response to the sur-reply (ECF No. 139). The parties have consented to proceed before a United States magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF 58). The Court has reviewed the record, as well as the pleadings and exhibits, and finds that no hearing is necessary. Loc. R. 105.6. For the reasons stated below, Defendants' motion will be GRANTED.

## I.  Background[2]

### A. Park Police

Park Police provides law enforcement protective and investigative services at parks, buildings, and other areas in Montgomery County and Prince George's County, Maryland under the jurisdiction of the MNCPPC, a bi-county agency established by the Maryland General Assembly. Riley, a civilian employee, has been the Director of Parks for the Montgomery County Parks Department since 2014. (Riley Dep. 5:4–9; Spencer Aff. ¶ 25). He provides "leadership, oversight and guidance to all functions" "at a high level" of the Montgomery County Parks Department. (Riley Dep.7:2–8:9, 17:15–18:11; Spencer Aff. ¶ 25). The Police Chief of the Park Police, Montgomery County Division, who oversees its day-to-day operations, reports to the Director. (Riley Dep. 18:11; DeVaul Dep. 35:18–36:2). McSwain was appointed Police Chief of the Montgomery County Division in May 2018, replacing Chief Antonio DeVaul, who served as Police Chief from 2012 to February 1, 2018, when he retired. (Spencer Aff. ¶ 27; DeVaul Dep. 24:20–25:13; ECF

---

[2]    Although certain claims Plaintiff asserts in the Third Amended Complaint are time-barred, as determined by the Honorable Theodore D. Chuang in the Court's ruling on Defendants' motion to dismiss (ECF 45), events preceding the applicable limitations periods may be relevant and may be considered in assessing the remaining claims upon the pending Motion for Summary Judgement. (*See* ECF 45 at 7, 9) (stating that (1) "the 'facts' relating to incidents occurring before February 20, 2018 ... may provide relevant evidence" on retaliation and hostile work environment claims; and (2) "[a]cts that occurred before September 11, 2016, however, remain relevant to the assessment of [Plaintiff's] remaining claims").

133-1 at 4). Uhrig transferred from the Prince George's County Division to the Montgomery County Division in 2012, where he served as one of the captains/ assistant chiefs under DeVaul until his retirement in August 2017.[3] (DeVaul Dep. 45:12–46:10, 48:13–20). Riley and Uhrig are Caucasian, and DeVaul and McSwain are African American. (ECF 132 at 18, 31).

The Montgomery County Division of the Park Police was comprised of several sections, including the Patrol, Special Operations, Community Services, and Investigative Services. (ECF 107-3 at 4). Park Police has both sworn and civilian personnel. (ECF 107-3 at 4). Sworn Park Police personnel with a rank of Sergeant or below are considered "officers."[4] (ECF 107-3 at 5). Sergeants can be promoted to Lieutenant, and Lieutenants to Captain, following their respective promotional processes. (Manley Aff. ¶ 4). Personnel with a rank of Lieutenant, Captain, and Chief are considered command staff. (ECF 107-3 at 6.) All newly promoted personnel have a probationary period of about twelve months, but there is no limitation on their supervisory powers. (DeVaul Dep. 63:18–65:2). But "[a] higher-ranking officer is not, per se, the supervisor of every lower-ranking officer." (Manley Aff. ¶ 12). "The authority of a higher-ranking officer to issue orders to lower-ranking officers outside their direct chain of command" applies in limited circumstances, such as when the higher-ranking officer is "the senior ranking officer at a scene." (Manley Aff. ¶ 15). The authority to issue lawful orders in such a situation does not confer supervisory authority on every higher-ranking officer in day-to-day circumstances.

---

[3]     Uhrig's police powers were suspended from October 2015 to January 2017. (Uhrig Dep. 221:19–223:2).

[4]     Most officers work four 10-hour shifts. (ECF 107-3 at 5). There are three shifts: days (7:00 a.m. to 5:00 p.m.); evenings (4:00 p.m. to 2:00 a.m.); and midnight (9:00 p.m. to 7:00 a.m.). A shift premium is paid for hours worked during the evening and midnight shifts. (ECF 107-3 at 5).

(Manley Aff. ¶ 17). Furthermore, "[a] higher-ranking officer outside the direct chain of command of a lower-ranking officer has no authority to discipline or otherwise affect the terms of a lower-ranking officer's employment." (Manley Aff. ¶ 18).

B. Supervision of Plaintiff by Uhrig in 2013 and 2014

Plaintiff, an African American man, began employment with MNCPPC as a police candidate for Park Police in April 1999. (Evans Dep. 114:8–9). Plaintiff met DeVaul in summer 1999, when DeVaul was Plaintiff's field training officer, and the two became friends. (DeVaul Dep. 16:9–21, 17:9–20). Plaintiff was promoted to the rank of Sergeant in June 2013 and was transferred from the Prince George's County Division to the Montgomery County Division, serving as a patrol supervisor with K-9 duties. (ECF 106-18 at 4). Plaintiff was assigned to the midnight squad supervised by Lieutenant Nicole Adams, an African American female officer serving as the evening and midnight squads' patrol commander at the time. (Adams Dep. 187:20–188:13). Uhrig was Adams' supervisor. (*Id*.) Before Plaintiff's transfer, Uhrig informed Adams of Plaintiff's friendship with DeVaul and alleged that Plaintiff had a habit of circumventing the chain of command while he was in the Prince George's County Division. (ECF 128-32 at 13). Uhrig advised Adams not to let Plaintiff jump the chain of command.[5] (ECF 128-32 at 13).

As a new Sergeant in his probationary period, Plaintiff's primary responsibility was patrol, and his secondary responsibility was overseeing the K-9 program, which only comprised of Plaintiff and one other K-9 officer. (ECF 128-32 at 21). At the time, the department was in the process of expanding the K-9 program, and DeVaul intended to

---

[5]     Uhrig also asked what Adams's relationship was with Plaintiff, and Adams answered that she considered Plaintiff a friend. (ECF 128-10).

create a standalone K-9 unit. (Adams Dep. 118:2–11; ECF 128-32 at 20, 21). Adams

initially understood that Plaintiff was intended to serve as the supervisor of the K-9

program, but Uhrig told her that Plaintiff "would be a member of the [K-9] team, not the

supervisor."[6] (Adams Dep. 20:8–21:19).

On July 10, 2017, Plaintiff requested that "center caps" he purchased be installed

on his assigned police cruiser, and Uhrig denied the request via email two days later.[7] (ECF

129-7). DeVaul also denied the request at his higher level of review. (DeVaul Dep. 151:4–

10). According to Adams, Uhrig raised additional issues regarding Plaintiff. (ECF 128-32

at 13). For instance, Plaintiff requested to have the front windows on his cruiser tinted.

Although the request was eventually approved, Adams recalled that Uhrig wanted

justification for the request, and there was "a lot of back and forth for that approval."[8]

---

[6]   According to a report generated from a later internal investigation, DeVaul's position was that, given Plaintiff's "background and knowledge in selecting the dogs and handlers, vendors, home inspections, and other details regarding K-9," Plaintiff was expected to perform duties such as reviewing dogs to be purchased, conducting related trainings and house inspections, and making relevant purchases. (ECF 128-32 at 21). In Uhrig's view, however, Plaintiff "was being evaluated as a patrol supervisor during the probation period, and problems might arise if he was "given duties other than those [he was] being evaluated on" and he did not meet the requirements due to the added duties. (ECF 128-32 at 35). But DeVaul stated that "all of the Sergeants were assigned additional duties even while under probation." (ECF 128-32 at 21). Still, both DeVaul and Uhrig agreed that Plaintiff's primary responsibility was to fulfill duties and responsibilities of a patrol Sergeant. (ECF 128-32 at 21, 35). Adams found Uhrig's directions regarding Plaintiff's duties "confusing," and she was not able to delegate all K-9 matters to Plaintiff based on Uhrig's directions. (ECF 128-32 at 13).

[7]   According to a later internal investigation report, Uhrig stated that installation of center caps on cruisers was not a common practice in the Montgomery County Division. (ECF 128-32 at 36).

[8]   Uhrig stated the request was approved because DeVaul confirmed that having the windows tinted was a common practice for K-9 vehicles in Montgomery County. (Uhrig Dep. 131:8–18). As DeVaul recalled, Uhrig noted that Plaintiff did not work during the day and therefore did not need the tint. (DeVaul Dep. 150:13–151:3). Shibu Philipose was present when Uhrig discussed the matter with the fleet manager, and according to Philipose, Uhrig said that because Plaintiff "work[ed] midnights or evenings … there [was] no need for him to have tint on …the vehicle." (Philipose Dep. 43:10–44:20). Philipose felt that "they were kind of making … fun of [Plaintiff's] request." (*Id.*)

(Adams Dep. 40:7–41:18). According to Adams, she also supervised two Sergeants, who were Caucasian, but whenever she met with Uhrig, "more issues were brought up in regards to [Plaintiff]" compared to any other Sergeant she had under her command. (ECF 128-10; ECF 128-32 at 13).

After Adams was transferred to a different section, Plaintiff was supervised by Lieutenant Bill Kellogg from September 1, 2013, to October 13, 2013. (ECF 128-10; ECF 128-32 at 21). Uhrig continued to serve as Plaintiff's second line supervisor.[9] Uhrig spoke to Kellogg about Plaintiff's friendship with DeVaul and advised Kellogg to make sure that Plaintiff followed the chain of command. (ECF 128-32 at 14). Kellogg was under the impression that Plaintiff was the K-9 supervisor, but Uhrig informed him that Plaintiff was not the K-9 supervisor. (ECF 128-32 at 14). Kellogg requested Plaintiff's assistance when tasked with conducting home visits and interviews of family members of K-9 handler candidates, but Uhrig denied that request. (ECF 128-32 at 14). According to Kellogg, Uhrig "overly question[ed] everything pertaining to K-9." (ECF 128-32 at 14).

On October 20, 2013, Uhrig was transferred to the Special Operations section, moving out of Plaintiff's chain of command, and Captain Linus Louketis was assigned to supervise Kellogg and serve as Plaintiff's second line supervisor. (ECF 128-32 at 19). From Louketis's perspective, Plaintiff's "duties and responsibilities were first as a patrol Sergeant supervising the midnight squad" with "additional responsibilities of supervising, managing, or assisting with the management of the K-9 functions." (ECF 128-32 at 19). Plaintiff was afforded the ability to make decisions on K-9 related matters under Louketis.

---

[9] "First line supervisor would be the direct supervisor of the individual. The second line supervisor would be one supervisor above that supervisor." (DeVaul Dep. 27:19–28:3).

(ECF 128-32 at 19). During this time frame, new dogs and handlers were added to the K-9 program. (ECF 128-32 at 14).

On June 20, 2014, the K-9 group was reformatted into a unit and moved from the Patrol section to the Special Operations section. (ECF 128-32 at 7). Plaintiff, who had been released from probation and was no longer supervising the midnight patrol squad, became the first K-9 Sergeant, exclusively overseeing the unit, which had a total of five members. (DeVaul Dep. 58:17–63:17; ECF 128-32 at 7; ECF 129-2 at 4). Lieutenant Shibu Philipose,[10] who is of Indian descent, became Plaintiff's first line supervisor, and Uhrig became Plaintiff's second line supervisor again. During a meeting with Philipose, Uhrig mentioned Plaintiff's friendship with DeVaul and advised Philipose to make sure that Plaintiff followed the chain of command.

Uhrig also discussed Plaintiff's schedule with Philipose. Uhrig wanted Plaintiff to work a schedule that included both evening and day shifts, but Plaintiff wanted to work evenings or midnights solely. (Evans Dep. 91:13–92:2; Philipose Dep. 20:20–21:7). Plaintiff's schedule became a controversial issue among his supervisors.[11] At the time,

---

[10]     Plaintiff and Philipose are friends. (Evans Dep. 161:9–12; Philipose Dep. 146:6–8).

[11]     According to a later internal investigation report, DeVaul wanted Plaintiff to work five eight-hour days covering day and evening shifts. (ECF 128-32 at 22). Uhrig believed that Plaintiff had daytime work responsibilities, and it would only make sense that he work a split schedule to include days and evenings. (ECF 128-32 at 35; Murphy Dep. 26:13–19). If Plaintiff only worked evening or midnight shifts, the two new dogs and handlers on day shift would have limited contact with their supervisor. Plaintiff testified that he would have no problem working a weekly rotating schedule, but switching the "days within the same week from evenings and day work ... was unhealthy and unprecedented." (Evans Dep. 96:15–99:1). Uhrig understood that rotating within a week was not easy to do, so he came to agree with rotating weekly or every two weeks. (ECF 128-32 at 35). From Philipose's perspective, while Uhrig oversaw work schedules as the assistant chief of the section, Philipose, as the commander of the section, would also have substantial authority over schedules. (Philipose Dep. 21:8–23:5). He reasoned that K-9 "typically gets involved with a lot more enforcement activity" in the evening, so it "would make more sense" for the K-9 supervisor to work most or all evening shifts, when "he would be more valuable to the K-9 unit." (Philipose Dep. 23:6–26:15).

Philipose supervised two other Caucasian Sergeants and a Caucasian barn manager. (Philipose Dep. 35:16–36:11). He testified that, "numerous times" during this period, "Uhrig questioned [Plaintiff's] time sheet or use of leave" but did not raise issues with anyone else's leave. (Philipose Dep. 27:21–30:16). Philipose had the impression that Uhrig "was very focused on [Plaintiff's] schedule." (Philipose Dep. 28:11–29:10).

During the time when Plaintiff was supervised by Philipose, Plaintiff had obtained items of work equipment (such as boots, a raincoat and a flashlight) from a vendor for testing and evaluating. (Philipose Dep. 104:8–107:17). Plaintiff asked Philipose if he could perform the equipment test, and Philipose did not oppose the request. (Philipose Dep. 107:3–17). When Uhrig became aware of the equipment test, he told Philipose that a formal request needed to be submitted to the Chief for approval, and at the end of the test, Plaintiff would have to submit a report with his findings. (ECF 128-32 at 15; Philipose Dep. 104:8–107:17).[12] At the direction of Philipose, Plaintiff submitted a memorandum through the chain of command on November 29, 2014, requesting the equipment test, and DeVaul later approved the request. (ECF 129-4; ECF 129-5). Plaintiff submitted his evaluation report on February 27, 2015 (ECF 129-6).

C. Supervision by Murphy and Uhrig in 2015

Philipose was transferred on December 21, 2014,[13] and was replaced by Murphy as Plaintiff's first line supervisor, with Uhrig continuing to serve as his second line supervisor.

---

[12] Philipose acknowledged that "there may have been a policy violation" in that Plaintiff skipped the step of having the testing authorized. (Philipose Dep. 107:3–17). According to DeVaul, "when someone wants to test and evaluate a piece of equipment," they are required to make the request in a memo sent "up through the chain of command" and, upon completion of any approved testing, complete an evaluation of the product and whether the agency should purchase it. (DeVaul Dep. 158:13–160:2).

[13] It appears that the deterioration of the work relationship between Philipose and Uhrig was the cause of the transfer. Some of the issues between Philipose and Uhrig were related to the K-9

(Murphy Aff. ¶¶ 2, 3; Murphy Dep. 100:15–16). Murphy was a friend of Uhrig. (*Id.*) At the time of this change, discussions of Plaintiff's work schedule were ongoing. (Uhrig Dep.140:9–142:20). Plaintiff was eventually given three options for a permanent schedule to work and chose to work 12:00 p.m. to 8:00 p.m., Monday through Friday. (ECF 128-32 at 8). Of the three sergeants under Murphy's supervision, Plaintiff was the only African-American. The others were assigned specific shifts, and Plaintiff was the only Sergeant whom Uhrig said had to work across two shifts. (Murphy Dep. 31:14–33:1).[14]

With the expansion of the K-9 unit, there were issues with internal requisitions related to K-9 care. (ECF 128-32 at 24). In January 2015, Murphy advised Plaintiff by email that one of his internal requisition requests for dog food needed to be corrected in that it did not provide the exact price and specific type of food, point out that Murphy had discussed the issue previously with Plaintiff. (ECF 129-8 at 2). Plaintiff responded that he was "confused" and offended by Murphy's email and requested a meeting with Murphy and Uhrig to discuss the matter. (ECF 129-8 at 2). Murphy forwarded the email to Uhrig with an "FYI," to which Uhrig responded, "Wow… I can not tell you how pissed his email makes me. We can talk when you next work, either tomorrow or Tues." (ECF 129-8 at 3).

On January 23, 2015, Plaintiff submitted a request to attend a suicide bombing prevention training program. (ECF 107-4 at 2). Training requests and recommendations were required to be "sent through the chain of command," the "ultimate decision" to approve the training was made by DeVaul as Chief. (DeVaul Dep. 89:2–8). Murphy

---

unit, and some apparently were related to communications between the two and departmental purchases. (ECF 128-32 at 15).

[14] According to a later internal investigation report, Plaintiff wanted to begin work thirty minutes before his shift, and Uhrig denied this request. No other supervisors in the Special Operations Section started work 30 minutes before their shift. (ECF 128-32 at 45).

initially recommended Plaintiff for the training, but, after speaking with Uhrig about the request, the decision was made not to recommend Plaintiff for the training.[15] (Murphy Dep. 38:20–41:14). On February 2, 2015, Uhrig disapproved Plaintiff's request, but DeVaul overrode that decision and approved the request on February 10, 2015. (ECF 107-4 at 2; ECF 128-14).

On February 18, 2015, there was a formal graduation ceremony for officers who completed certain K-9 trainings, which Plaintiff helped organize. Plaintiff requested authorization to purchase certificates or plaques for the ceremony approximately one month beforehand. The common practice was that the certificates and the frames housing the certificates would be supplied by the Park Police. (Uhrig Dep. 189:16–190:8). On February 12, 2015, Plaintiff submitted an internal requisition for plaques, which was approved. (ECF 129-11). On the same date, Plaintiff purchased four frames to house certificates, and on February 18, 2015, he submitted a petty cash request of $79.93 for this purchase. (ECF 128-32 at 9; ECF 129-10). Murphy told Plaintiff that he did not think the request would be approved because approval was not obtained in advance of the purchase. (Murphy Dep. 57:13–58:2). Plaintiff told Murphy that if there were any problems, he would pay for the frames himself, and Murphy stated he would pay half of the cost. (Murphy Dep. 57:13–58:4, 232:1–4). Plaintiff's request was approved by Murphy, Uhrig,[16] the purchasing department, and finally DeVaul, and Plaintiff received reimbursement in the full amount requested. (ECF 129-10; Uhrig Dep. 191:3–192:10).

---

[15]     Murphy also recommended a Caucasian female officer who was a bomb dog handler for the training, but her request was later denied. (Murphy Dep. 38:20–41:14, 45:12–46:6).

[16]     Uhrig approved the request following a conversation with DeVaul. (Uhrig Dep. 196:4–9).

On March 3, 2015, at Uhrig's direction, Murphy gave Plaintiff a workplace performance counseling for the unauthorized purchase of the frames and for improper or inaccurate submission of internal reimbursement requests. (ECF 129-11; Uhrig Dep. 188:7–12). The counsel document advised Plaintiff to ensure he had "prior authorization and approval from the Section Commander" before making any departmental purchase and to provide his requests in writing "on the proper document and free of errors." It also "reminded" Plaintiff to "follow [his] chain of command for all requests. (ECF 129-11). Such counseling is not considered disciplinary action. (DeVaul Dep. 238:16–21; Murphy Dep. 50:8–51:17). It is a documented discussion between an officer and supervisor regarding a perceived need for improvement or correction in the officer's work performance. (Murphy Dep. 50:8–51:17). According to Murphy, the counseling document would be "kept in the supervisory file" for a period of one year. (Murphy Dep. 50:8–51:17). Although he took issue with how Plaintiff's breach of protocol was handled by Uhrig and Murphy, DeVaul let the counseling stand, reasoning that "the written policy require[d] that staff get approval prior to purchases" and Plaintiff "violated the policy.". (DeVaul Dep. 90:20–91:18, 242:212–243:14).

On March 5, 2015, Plaintiff submitted a rebuttal memorandum through his chain of command objecting to the counseling and describing the circumstances in which the petty cash request was discussed between Plaintiff and Murphy and ultimately submitted and approved. (ECF 128-23). Plaintiff expressed his view that Uhrig had been "unjustly scrutinizing [him] in attempts to find fault with [his] performance, integrity and professionalism since [he] was promoted to the rank Sergeant." (*Id.*) Plaintiff also requested that the counseling document be removed from his personnel file. (*Id.*) DeVaul

11

instructed Uhrig, Murphy, and Plaintiff to meet to discuss the counseling, and the three

officers met on March 16, 2015.[17] (Uhrig Dep. 196: 15–21; DeVaul 94:18-95:4).

On March 20, 2015, Plaintiff filed a formal complaint against Uhrig "in regards to

the unfair treatment, targeting, biases and false allegations made against [Plaintiff] during

his time as [Plaintiff's] captain." (ECF 106-28 at 2). The complaint raised several issues

related to matters such as scheduling, training, and the performance counseling, but it did

not mention race or include any allegations of race discrimination. (ECF 106-28). Because

of the complexity of issues raised in Plaintiff's internal complaint, DeVaul referred it to

the Prince George's County division for further action.[18] (DeVaul Dep. 260:8–261:3).

On April 3, 2015, DeVaul announced that he would be attending a training from

April 6 to June 12, 2015, and Uhrig would serve as Acting Chief during his absence. (ECF

107-9). Uhrig received an award on June 17, 2015, for "perform[ing] above and beyond

expectations." (ECF 107-1). Additionally, DeVaul gave Uhrig highest possible ratings on

his performance evaluation for the period August 2014 through August 2015 and

commented that Uhrig's performance was exceptional. (ECF 107-2).

D. Internal Investigation of Uhrig and Murphy

On April 10, 2015, the K-9 unit was transferred back to the Patrol section and under

the supervision of Lieutenant Patrick Lau,[19] and Murphy was no longer Plaintiff's direct

supervisor. (Spencer Aff. ¶¶ 16, 17; Lau Dep. 14:6–11; Murphy Aff. ¶¶ 4–6). As a result

---

[17]    Plaintiff asked to have a Fraternal Order of Police ("FOP") representative present, but that was deemed unnecessary by DeVaul. (Uhrig Dep. 197:1–8).

[18]    DeVaul made Uhrig aware that a complaint was filed, but he did not discuss the specifics with Uhrig. (DeVaul Dep. 261:12–17; Uhrig Dep. 110:15–18). DeVaul believed that "[i]t was important that he understood that a complaint was filed, so any action that he took wouldn't be misconstrued as retaliation." (DeVaul Dep. 263:10–20).

[19]    Plaintiff and Lau are friends. (Adams Dep. 72:3–74:1).

12

of the change to the organizational structure, Uhrig was no longer in Plaintiff's chain of command. (Uhrig Decl. ¶¶ 8–12).

Lau asked Murphy for Plaintiff's exit evaluation and supervisory working file. An exit evaluation is a common performance management document designed to provide the incoming supervisor an overview of an employee's performance from his former supervisor in any given evaluation period. (Lau Dep. 13:2–15). There are four parts to the exit evaluation form: (1) performance factors, (2) essential job functions and performance standards, (3) overall performance rating, and (4) supervisory comments. (ECF 129-12). For the first three parts, the supervisor reviews and evaluates the staff member's performance using ratings from 0 to two 2, with 2 being the highest possible score. (*Id.*) In the exit evaluation Murphy completed, Plaintiff's average factor rating was 1.4, his job function majority rating was 2, and his overall performance rating was 2. (*Id.*) In the supervisory comments section, Murphy "documented some of the shortcomings" he had seen in Plaintiff's performance and "some of the concerns" he had with Plaintiff, such as alleged "neglect of newly acquired dogs and their partners who worked on the day work shift," the lack of K-9 equipment and supplies, Plaintiff's communication skills, and his poor enforcement statistics. (ECF 129-12; Murphy Dep. 127:19–131:5). Murphy also noted that Plaintiff had "conflicts with people both in and outside of this chain of command" and encouraged him to work on fostering better relationships with his co-workers. (ECF 129-12 at 8).

On July 21, 2015, Plaintiff, Murphy, and Lau met to discuss the exit evaluation in Lau's office. Lau described the interaction between Plaintiff and Murphy as "tense." (Lau Dep. 30:7–38:15). During the meeting, Murphy stated words to the effect of "tak[ing]

13

[Plaintiff] down" by revealing "some of the things he'd done wrong," such as taking departmental property home and inaccurate timekeeping, and that Plaintiff would be "held accountable because there was hopefully someone that was going to do a correct and thorough investigation." (Murphy Dep. 257:10–258:10; Lau Dep. 41:15–43:7).

After the meeting, Plaintiff submitted a rebuttal to the exit evaluation in writing, characterizing the evaluation as "the continuation of discrimination, false allegations and unfair treatment that [Plaintiff] received from Captain Uhrig" and "an attempt to misrepresent and disparage [Plaintiff] during the time [he] served under [Murphy's] direct supervision." (ECF 129-13). Plaintiff further stated Plaintiff's belief that the evaluation was "retaliatory" for the internal complaint Plaintiff filed against Uhrig and Murphy and "another example of Lieutenant Murphy and Captain Uhrig conspiring against [Plaintiff] to see [his] professional demise." (*Id.*) Plaintiff's rebuttal did not mention race or include any allegations of race discrimination.

Lau submitted his record of the meeting between Plaintiff and Murphy to DeVaul on July 22, 2015. (ECF 129-14). Lau stated that he was "convinced" that he had witnessed "threats of retaliation by Lt. Murphy[,]" when Murphy made comments about "filing a months old complaint[,]" which came after Plaintiff's response to Murphy's exit evaluation and "his informing Lt. Murphy that he had filed charges against [Murphy] over events that occurred while under his command in Special Operations." (*Id.*) Lau questioned Murphy's motives and aggression and "whether the exit evaluation itself was not written as some sort [of] retaliatory document[.]" (*Id.*) There is no mention in this report of any alleged race discrimination or retaliation for complaints of race discrimination.

14

Case 8:19-cv-02651-MMM Document 153 Filed 05/05/23 Page 15 of 67

On July 26, 2015, Plaintiff sent Adams an email with the subject line, "Additional concerns" and dated July 26, 2015, which contained further complaints of disparagement and retaliation by Murphy and unfair treatment by Uhrig and a response to allegations by Murphy that Plaintiff misappropriated Park Police property. (ECF 129-15). Plaintiff did not mention race or allege race discrimination or retaliation for complaints of race discrimination.

In August 2015, Plaintiff's formal complaint against Uhrig was assigned to Lt. Pamela Skaife for an investigation, and Plaintiff's complaints about Murphy were included in the investigation.[20] (ECF 128-32 at 44). During the investigation, Plaintiff, Uhrig, Murphy, and fifteen other witnesses were interviewed. (ECF 128-32 at 44). On October 14, 2015, DeVaul ordered that Uhrig be suspended with pay pending the outcome of the investigation. (ECF 129-23; DeVaul Dep. 172:3–14).

The investigation revealed emails to and from Uhrig containing racially insensitive content (ECF 128-31 at 50), which are described below:

1)      Uhrig received an email with a video attachment dated September 5, 2014, which reads: "Another one of those thought provoking conversations between the youth of our country in todays world where they attempt to tackle tough mathmatical [*sic*] questions. I didn't carch [*sic*] it. Did any of these scholars grab their crotch or put their hands down their pants (ghetto mandatory) prior to answering this harbinger?" (ECF 129-18). Uhrig

---

[20]      All sworn officers of Park Police are covered by Law Enforcement Officers' Bill of Rights ("LEOBR"). (ECF 133-1 at 4). Sworn officers are "entitled to an official LEOBR investigation before any disciplinary action can be effected. LEOBR investigations must be completed by a law enforcement agency." (*Id*.) Under the LEOBR, if an investigation is conducted, allegations are either sustained or not sustained based on the results of that investigation. (DeVaul Dep. 250:18–251:5). If allegations are sustained, an officer has a right to request a Hearing Board or Trial Board for determination by other officers, as to whether he or she is guilty of those sustained allegations. (DeVaul Dep. 250:18–251:5).

responded, "Stop taping Brownlee's kids," in reference to the Chief of the Prince George's County Division, who is African American. (*Id*.; ECF 140 at 24).

2)        Another email chain initiated by Uhrig to another officer on January 2, 2015, insulted Philipose, who is of Indian descent. Uhrig first stated that Philipose's office space "smelled like a Vietnamese whore house." (ECF 129-16). The other officer responded, in part, that Philipose "is doing voodoo which [sic] doctor shit over a picture of his old Captain," and asked Uhrig, "How do you feel??" Uhrig replied, "I feel health and ready to play Cowboys and Indians…. They lost that war." The other officer responded, "We lost a few in the fighting w the Indians. I think they got scalped!" (ECF 129-16). Uhrig replied, "might lose a battle or two, but I will win the war," and questioned why Philipose had "the *Bible* on his desk … shouldn't that be like the 'Tipitaka'???" (ECF 129-16).

3)        An another email chain dated July 29, 2015, included correspondence between an officers and a retirement plan specialist in which the officer inquired about the status of a form the officer submitted several weeks prior. The retirement plan specialist responded that the forms were sent to a member of the officer's human resources department and that she would follow up to see if the forms were processed. After this exchange was forwarded to Uhurig, he responded, "Clearly on CP time," (ECF 129-17), apparently referring to the delay in processing the forms as "colored people time."

4)        An email DeVaul sent Uhrig and another individual dated August 24, 2015, displays an image of apparently Latina women with bananas draped across their faces and carrying handguns. The subject line reads, "Girls (Patty) in the hood. Don't mess with Wheeeeeetoon!" (ECF 129-19). The subject line is an apparent reference Wheaton, a place

16

in Montgomery County with a large Latin community, according to Plaintiff. (ECF 129-1 at 25).

The existence of the foregoing emails was leaked, and Plaintiff but did not see the emails until they were produced in discovery in the instant litigation.[21] (Evans Dep. 239:13–245:9).

After months of investigation into Plaintiff's complaint against Uhrig and Murphy for events that took place between June 24, 2013, and July 21, 2015, Skaife submitted her report on March 8, 2016. (ECF 128-32). Of nine allegations against Uhrig, six were sustained and three were not sustained:

> Allegation #1: Rumors. Plaintiff alleged that Uhrig "on several occasions" made false statements to Plaintiff's immediate supervisors regarding Plaintiff's failure to follow chain of command. This allegation was sustained.

> Allegation #2: Harassment.  Plaintiff alleged that Uhrig "created a hostile work environment by denying [Plaintiff] the opportunity to supervise the K-9 unit while on probation." Uhrig "gave conflicting and unclear direction regarding [Plaintiff's] duties and responsibilities … in regards to the K-9 unit during his probationary period." This allegation was sustained.

> Allegation #3: Harassment. Plaintiff alleged that Uhrig "repeatedly interfered with his schedule in order to harass [Plaintiff]." This allegation was sustained.

> Allegation #4: Harassment. Plaintiff alleged that Uhrig "purposefully denied, placed on hold, and overly scrutinized internal requisitions submitted by [Plaintiff] and attempt to harass" him. This allegation was non-sustained.

> Allegation #5: Compliance; Failure to Follow Proper Purchasing Procedures. "Internal requisitions were held pending funding or denied" by Uhrig "who failed to forward to either the requisition pending funding to the fiscal affairs manager or return to the denied request to the requester." This allegation was sustained.

---

[21]     The circumstances under which Plaintiff became aware of the emails are not clear. (Evans Dep. 239:13–245:9).

Allegation #6: Harassment. Plaintiff alleged that in a meeting in March 2015, Uhrig "questioned [him] repeatedly regarding his accusations of unfair treatment" by Uhrig. Uhrig "also denied repeated requests [by Plaintiff] to have a witness on his behalf present during this meeting." This allegation was sustained.

Allegation #7: Prohibited Use or Conduct; Electronic Communications Policy. "During the course of the investigation a check of emails both to and from [Uhrig] contained inappropriate content." This allegation was sustained.

Allegation #8: Discrimination and Allegation #9: Conduct Unbecoming. "It was alleged that [] Uhrig participated in unfair treatment of [Plaintiff] based on his race." These two allegations were non-sustained.[22]

(ECF 128-32 at 48–51). Of three allegations against Murphy, two were sustained and one was not sustained:

Allegation #1: Decorum. Plaintiff alleged that Murphy "during a telephone conversation in February 2015, became angry started yelling and cursing at" Plaintiff. This allegation was non-sustained.

Allegation #2: Retaliation and Allegation #3: Conduct Unbecoming. Plaintiff alleged that "in response to his claim of including [] Murphy in his complaint regarding unfair treatment," Murphy "issued an unfavorable exit evaluation." These allegations were sustained.

(ECF 128-32 at 51–52).

On June 14, 2016, Murphy had an Administrative Hearing Board (or Trial Board) concerning the charges sustained against him. (Murphy Dep. 143:12–144:2; ECF 106-29). The Hearing Board was chaired by a retired African American male officer, and the two other members were Caucasian male officers. (Murphy Dep. 125:11–126:1). The Board found Murphy not guilty of the retaliation and conduct unbecoming. (ECF 106-29).[23]

---

[22]    It was found that Uhrig "has made no comments regarding [Plaintiff's] race" and that Uhrig's treatment of Plaintiff "is consistent with the treatment of other subordinates under his command." Although Uhrig "was critical and scrutinized all paperwork submitted, it was found this treatment was the same to others of different races and sexes." (ECF 128-32 at 51).

[23]    Murphy testified that information regarding the charges against him and potential penalty was leaked before his Trial Board. (Murphy Dep. 120:1–20). After the Hearing Board concluded,

Uhrig returned to the Montgomery County Division after his suspension but was not placed in Plaintiff's chain of command. (DeVaul Dep. 172:3–17; Uhrig Decl. ¶¶ 9–11). DeVaul testified that he had a conversation with Riley about Uhrig voiced his objection to Uhrig's return, but "the decision was made to bring [Uhrig] back." (DeVaul Dep. 315:14–316:6). On or about June 7, 2017, Plaintiff and eight other officers (including Philipose, Lau, and Adams) emailed Riley, the Chair and the Co-Chair of MNCPPC, and others voicing concerns over Uhrig, Murphy, and one retired officer, Lieutenant Matthew Milbourne.[24] (DeVaul Dep. 102:1–104:5, 211:13–212:13; ECF 128-40). Calling Uhrig, Murphy, and Milbourne "organizational terrorists," the email alleged that this "group of supervisors has been terrorizing the Agency for many years" and "targeted officers including many African-American and women for some time," but they "have not been held accountable and continue their discriminatory and prejudicial practices."[25] (ECF 128-40). The letter accused Uhrig, Murphy, and Milbourne of using "racist slurs and question[ing] the intelligence of African-Americans[,]" claiming that many of the

---

Murphy was immediately suspended, and Philipose stripped him of his police powers by removing his credentials, gun, and other items. The suspension was rescinded within a matter of hours. (Philipose Dep. 339:4–17, 342:17–19; DeVaul Dep. 294:4–296:13).

[24]    Philipose also emailed DeVaul on June 2, 2017, documenting "continuous unprofessional behavior" by Uhrig that had "been heightened since his return from suspension." The email states, in part, "On several occasions when I pass him in the hallway I offer my respect to his rank by greeting him and he completely ignores it and looks at me with disdain." (ECF 129-26). Philipose also expressed his dismay about how he had "come to understand [Uhrig] is racially biased against [him]" through "some private communications" uncovered "[d]uring the previous year's internal affair investigation." (ECF 129-26).

[25]    When asked what "terrorizing" meant, Adams testified it "might have not been the right word." (Adams Dep. 166:2–19). She felt that there was a "divide" among the officers. (Id.) Lau testified that "terrorizing" was "a very aggressive word" but denied writing it. (Lau Dep. 186:3–7). Philipose testified that he did not recall who drafted the email, and he did not recall most details about this email. (Philipose Dep. 216:4–222:9). Philipose did not recall any discussion with Plaintiff about the use of the term "organizational terrorists." (Philipose Dep. 222:7–9).

19

signatories had "direct stories of being mistreated by this group." (*Id.*) The letter expressed concern over Uhrig returning to duty and Murphy being recently named an Acting Captain and complained of discourtesy and "negative interactions" from both Uhrig and Murphy. (*Id.*) Uhrig retired on August 31, 2017, in good standing. (ECF 129-25; Uhrig Dep. 14:19–15:1; DeVaul Dep. 190:8–191:6).

    E.  <u>OIG and OIA Investigations of Plaintiff</u>

    Plaintiff became Acting Lieutenant in February 2016 was promoted to the rank of Lieutenant in December 2016. (Evans Dep. 70:20–71:7; ECF 106-18 at 2).

    In 2016, Murphy discussed with Uhrig a complaint of fraud, waste, and abuse he was considering filing against several officers, including Plaintiff. (Uhrig Dep. 108:6–9; 119:9–14). Murphy testified that he was trying to "use [Uhrig's] memory of events to make sure that [he] wasn't either misrepresenting something or saying something that wasn't true." (Murphy Dep. 225:4–14). On January 13, 2017, Murphy submitted an internal complaint alleging suspected fraud, waste, abuse, and other misconduct by Plaintiff and six other officers, two of whom were African American, three of whom were Caucasian, and one of whom was of Indian national origin. (Murphy Dep. 146:1–7; Spencer Aff. ¶ 21). Murphy also alleged that he was discriminated against because of his race. (Riley Dep. 52:13–18).

    On April 6, 2017, MNCPPC's Office of Internal Audit ("OIA") "received an anonymous notification regarding alleged 'illegal and unethical activities'" within the Montgomery County Division. (ECF 107-5 at 4). The allegations related to financial and managerial misconduct, including allegations related to the establishment of the K-9 unit and the appointment of the K-9 supervisor, testing of equipment, approval of trips and

conferences, and overtime. (ECF 107-5 at 4–5). Park Police personnel subject to the allegations included Plaintiff, ▮▮▮▮▮▮▮▮▮▮ and others. (ECF 107-5 at 4–5).

On April 24, 2017, Riley requested that the Chief Internal Auditor at OIA assist in an investigation into three allegations made by Murphy: (1) that Plaintiff took a new, unpackaged dog house from Park Police to his home and deprived the K-9 unit of the needed equipment; (2) that Plaintiff used Commission funds to purchase plaques to recognize Commission employees who had assisted the K-9 unit without giving these plaques to the intended recipients, resulting in the waste of Commission funds; and (3) that Plaintiff received two awards for the same matter resulting financial benefit of two days of administrative leave for the same event. (ECF 129-28). These allegations were included in the OIA's audit stemming from the anonymous notification on April 6, 2017. (ECF 107-5 at 5).

The OIA's audit report was complete on July 25, 2017. (ECF 107-5). There were thirteen allegations against various of Park Police personnel. (ECF 107-5 at 4–5). The purpose of the OIA's review was to determine if any Park Police personnel committed fraud, waste, and abuse between from July 1, 2013, to July 21, 2017. (ECF 107-5 at 6–7). Three allegations were referred to the Division of Human Resources and included abuse of power, manipulation of facts, retaliation by Plaintiff, ▮▮▮▮▮▮▮▮▮▮▮▮ special treatment of Plaintiff; and failure to follow the competitive process for establishing the K-9 unit and appointing the K-9 supervisor, in violation of the FOP Collective Bargaining Agreement. (ECF 107-5 at 4). One allegation was referred to the MNCPPC's Office of the General Counsel ("OGC"), and the OIA's audit report addressed the remaining nine allegations. (ECF 107-5 at 4, 27).

21

The OIA found that six of the nine allegations were unsubstantiated but that actions by Plaintiff and        constituted violations of MNCPPC policies. (ECF 107-5 at 27). Among the sustained allegations against Plaintiff was that he improperly accepted MNCPPC property, a doghouse, for personal use.[26] (ECF 107-5 at 27). However, the OIA determined that Plaintiff's action do not support a conclusion of fraud, waste, or abuse as the doghouse "was considered surplus by Park Police command staff," and he received permission from his command staff to take the doghouse home. (ECF 107-5 at 27). The OIA did not find that Plaintiff's actions in connection with the undistributed plaques and receipt of multiple awards constituted fraud, waste, and abuse. (ECF 107-5 at 14, 20). Ultimately, Plaintiff "received no disciplinary action as a result of any of the allegations against him in Murphy's complaint [from January 2017]." (Spencer Aff. ¶ 24).

Apparently as part of the investigation referred to OGC, Plaintiff was interviewed on November 20, 2017. (ECF 129-30). On December 14, 2017, Plaintiff sent an email to Riley stating that, since filing his complaint against Uhrig and Murphy, he had been "subjected to repeated unwarranted investigations and accusations that have resulted in not only the compelled interrogation, but internal audits." (*Id.*) Plaintiff attributed his "compelled interrogation" as a response by Riley and OGC "to an obviously baseless and retaliatory complaint filed by Lieutenant Michael Murphy." (*Id.*) In the email, Plaintiff claimed that he filed a complaint in 2016 "over racially discriminatory work practices and retaliation against [Murphy and Uhrig]." (*Id.*) Plaintiff requested that Murphy be

---

[26]      "Commission Practice No. 2-15, *Employee Use of Commission Property* states the use of Commission property is intended for the conduct of official business of the Commission. The use of Commission property for non-Commission business or personal gain is prohibited." (ECF 107-5 at 9).

22

transferred from the Montgomery County Division, "investigated by an independent entity," and disciplined, if warranted. (*Id.*)

Also in November 2017, Riley forwarded to OIG a complaint against a Park Police Captain, not a party to this litigation, for alleged timekeeping fraud. (ECF 133-1 at 4, 24). The complaint was initially sent to DeVaul on May 25, 2017, signed by "[a] group of highly concerned Park Police employees." (*Id.*) OIG agreed to investigate the matter and "to assess the overall timekeeping procedure within the Park Police." (ECF 133-1 at 4). In January 2018, OIG interviewed Murphy as part of this investigation. (ECF 128-42). After the meaning, Murphy retrieved some of Plaintiff's time sheets, saw transactions that he believed were intentionally inaccurate, and relayed the information to OIG.[27] (Murphy Dep. 201:18–207:4). Murphy testified that he also told Uhrig about the time sheet issue because of Uhrig's familiarity with "a long-term pattern of fraud and corruption that had been occurring with several people within Park Police." (Murphy Dep. 209:18–210:11).

On March 1, 2018, the OIG received an allegation from an anonymous caller via the Ethics and Compliance Employee Hotline stating that Plaintiff committed a timekeeping error "on the MLK Holiday" that "could lead to over payment if not caught by payroll." (ECF 129-27; ECF 133-1 at 16). The caller alleged that Plaintiff's time sheet was approved by ████████ and that "this has been an ongoing problem" with ██ (ECF 129-27). This allegation was included in OIG's timekeeping investigation. (ECF 133-1 at 16).

---

[27] "All employees of [MNCPPC], including the Park Police, have the obligation to report suspected fraud, waste and abuse." (Spencer Aff. ¶ 2).

OIG completed its report on April 25, 2018, concluding that "[MNCPPC] timekeeping procedures are not consistently followed within Montgomery County Park Police." (ECF 133-1 at 20). OIG found that the timekeeping issues were "pervasive throughout the Department's Command Staff and [could] primarily be attributed to 'tone at the top.'" (ECF 133-1 at 20). OIG found lack of consistency in timekeeping requirements and enforcement, specifically that "personnel treated differently based on alliances, and concluded that the inaccurate timekeeping was "intentional." (ECF 133-1 at 20). As to Plaintiff, the OIG concluded that his actions "[met] the definition of fraud as defined by Commission Practice 3-31, Fraud, Waste, and Abuse[,]" that he "falsified his time card for the days reviewed and misappropriated $676.61 in wages[,]" and it was "reasonable to conclude that inaccurate time card reporting is not limited to the days reviewed." (ECF 133-1 at 22). Consequently, Plaintiff and ▮▮▮ along with two other sworn officers, "were referred to an external law enforcement agency designated to complete LEOBR investigations." (ECF 133-1 at 23; ECF 107-8 at 2).

DeVaul retired in February 2018, and in May 2018, McSwain was hired as the new chief of the Montgomery County Division. The LEOBR investigations were cancelled when Riley and McSwain, the new Chief of the Montgomery County Division, decided to issue counseling to, and collect restitution from, the four officers instead. (ECF 107-6; ECF 107-8 at 2; ECF 133-1 at 23. On July 3, 2018, McSwain issued counseling to Plaintiff about the timekeeping issues identified in the OIG's report, stating that Plaintiff's error was "an honest mistake" and Plaintiff had "demonstrated a good faith effort to correct an overpayment and reimburse the Commission." (ECF 106-33). The counseling advised Plaintiff to "take time to double check" his time sheets to avoid further mistakes. (*Id.*)

24

F.   HRX Investigation and Report on Workplace Behavior

HRX Systems, LLC ("HRX") was engaged to investigate issues affecting workplace culture of the Montgomery County Division in response to the letter of June 7, 2017, signed by Plaintiff and eight other officers regarding "inappropriate workplace behavior" by Uhrig and Murphy. (ECF 128-49). HRX interviewed fifteen staff members (including Plaintiff, Murphy, Adams, Kellogg, Philipose, and Lau) and submitted its report on June 13, 2018. (*Id*.)

The report noted a general lack of "understanding of workplace sensitivity, harassment and sexual harassment, conflict resolution, and emotional intelligence." (*Id*.) As to any racial tensions among the staff, the report noted the presence of "two main cliques within the police force[,]" with members of each group accusing members of the other group of racial basis (*Id*.) HRX found that "[t]he adversarial relationships seemed to be between two polar groups of individuals who unequivocally had an 'us and them' attitude which creates unnecessary tension among the staff." (*Id*.) The report noted perceptions of favoritism among the staff, identifying the friendship between DeVaul and Plaintiff as an example, and a practice among officers using the grievance process to block promotions for others whom they did not like. (*Id*.) The report also noted that "[a] lot of time and energy [was] spent dealing with office politics and interpersonal differences." (*Id*.)

HRX recommended anti-harassment training and "interpersonal training" in the areas of "workplace sensitivity, conflict resolution, communication, teambuilding, and emotional intelligence"; and reviewing promotion policies and practices; among other recommendations. (*Id*.)

25

G. <u>McSwain's Response to the HRX and OIG Reports</u>

McSwain worked to address concerns highlighted in both the OIG report and the HRX report. Specifically, on September 5, 2018, he conducted a leadership training for the entire command staff, covering topics such as "leadership, conflict resolution, communication skills, interpersonal relationships, creating a healthy culture, employee development, and dealing with crisis." (ECF 128-46 at 5).

On September 10, 2018, Plaintiff asked Adams to submit to McSwain a statement concerning Murphy, who was a Captain[28] at the time. (ECF 128-48). In the statement, Plaintiff complained of "an ongoing hostile work environment[,]" referenced prior complaints about Uhrig and Murphy and "several retaliatory investigations[] initiated by Murphy, and claimed that Murphy had "the ability to retaliate against" Plaintiff in his current position. (*Id.*) Plaintiff noted having attended McSwain's recent leadership training, complained that Murphy's presence made him sick, and "ask[ed] to be excused from participation from any meetings and or training attended by Murphy." (*Id.*) McSwain responded, stating, in part, "there have been no proven matters brought to my attention that would suggest to me that the mere presence of Captain Murphy constitutes a hostile working environment[,]" pointing out that Murphy was not in Plaintiff's chain of command, and concluding that Plaintiff's allegations and request were "without merit." (ECF 128-48). McSwain testified that he created a new branch of the Montgomery County Division and assigned Murphy to that branch to minimize contacts between Plaintiff and Murphy and to avoid placing Murphy in Plaintiff's chain of command. (McSwain Dep. 87:16–89:13).

---

[28]     Murphy was promoted to Captain around July 2018. (McSwain Dep. 98:13–21).

On November 15, 2018, McSwain sent OIG a report sharing definitive actions he had taken to address the cause of concerns identified in the OIG report. (ECF 128-46). The report provided an outline of efforts made to address OIG's recommendations, including ethics and timekeeping trainings and a meeting with the command staff for refreshers on workplace matters such as discrimination, conflict resolution, and harassment. (ECF 128-46 at 4–5). Additionally, a cultural sensitivity training was planned to foster greater appreciation for cultural differences and understanding. (*Id*.)

    H.  EEOC Complaint

Plaintiff filed a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 17, 2018. McSwain did not notice of the EEOC complaint until June 27, 2019, when he received notice from OGC. (McSwain Dep. 90:14–91:7).

    I.  "Medical Suspension"

On or about February 28, 2019, Plaintiff suffered a head injury while conducting a promotional evaluation for the St. Mary's County Sheriff's Department and took leave from work as a result of the injury. After Plaintiff's visit with a physician, and Park Police was advised that Plaintiff would be off work until roughly March 8, 2019, when a reassessment would be done. (McSwain Dep. 41:4–44:14). The physician opined in a note dated March 12, 2019, that Plaintiff "suffered a concussion" and "should not be working in a situation where there could be sudden acceleration/deceleration or significant rotation of the head left to right." (ECF 128-50). The physician also stated that Plaintiff "will be reassessed in a few days to test for progress." (*Id.*)

27

On March 14, 2019, McSwain received the note, which led him to believe that a temporary suspension was warranted until Plaintiff's medical condition changed. (McSwain Dep. 41:7–44:14). McSwain instructed Adams, Plaintiff's supervisor at the time, to temporarily collect Plaintiff's police equipment and to "follow the department directive that speaks to the issue." (Adams Dep. 66:5–8; McSwain Dep. 41:7–44:14). The relevant directive was determined to be MNCPPC's Administrative Procedure 708.0, which, in part, contemplated "light duty status" for employees injured on the job and called for administrative restriction of police powers for any police personnel granted "light duty status." (McSwain Dep. 41:7–44:14; ECF 128-52 at 2). Administrative restriction of police powers involved the officers surrendering their firearms and police credentials. (ECF 128-52 at 2). Adams testified that, typically, the officer's duty-issued firearm and assigned police cruiser would be taken, but, in Plaintiff's case, Adams was instructed to collect "all serialized equipment, handcuffs, radio, MDC, mobile data computer." (Adam Dep. 64:16–65:2). An emergency suspension checklist was modified with handwritten notes to include items such as handcuffs and taser. (ECF 128-51 at 2). McSwain told Adams that the foregoing items should be seized as a precaution for Plaintiff's medical concerns. (Adams Dep. 65:15–66:4). Plaintiff's police credentials and equipment were temporarily seized as a result.

McSwain testified that, following his injury, Plaintiff was on a no-duty suspended status because his physician "stated that he was not to be at work" and had diagnosed him with a concussion, a traumatic brain injury, without indication of Plaintiff's limitations and whether his judgment or memory were affected. (McSwain Dep. 56:3–57:9). McSwain believed that Administrative Procedure 708.0 allowed for an officer's police powers to be

restricted if the Chief determined that such restrictions would be in the agency's best
interest. (McSwain Dep. 58:16–59:5, 60:9–13).[29] On March 18, 2019, McSwain received
a status update that Plaintiff would be able to return to full duty on March 22, 2019.
(McSwain Dep. 44:9–14). All of the equipment that had been seized were returned to
Plaintiff on March 22, 2019. (*Id.*)

McSwain testified that Plaintiff was not the only officer whose equipment was
taken during a medical suspension. In November 2018, a Caucasian female officer who
suffered a medical emergency had "the exact same items, if not more," seized from her as
Plaintiff. (McSwain Dep. 51:11–53:5; 54:2–55:21). In December 2018, another Caucasian
female officer who suffered an injury to the hand was able to continue work with
accommodations and only had her credentials, vehicle, and weapon seized under
Administrative Procedure 708.0. (McSwain Dep. 51:11–53:5; 47:5–48:16). Plaintiff
testified that a Caucasian male officer, who was out for an extended period of time did not
have any equipment taken from him "until a considerable amount of time later[.]" (Evans
Dep. 417:7–418:10). McSwain testified that this officer had a surgery in 2018 and received
preliminary approval for immediate return to work on a light-duty status, but ended up on
leave for weeks. (McSwain Dep. 170:15–172:6). McSwain did not recall the details of
which items were seized from this officer. (McSwain Dep. 172:7–15).

---

[29]     "The Chief of Police has a responsibility to protect the Agency and the general public when
an officer is incapacitated as a result of an injury for any period of time." (Manley Aff. ¶ 19). Darien
Manley, who served as Chief of the Montgomery County Division from March 2008 until April
2012, has submitted a sworn affidavit stating, in part, "If I had any doubt that an officer was not
fully mentally or physically capable of performing their duties as a police officer, I would collect
their weapon, vehicle and any other item that could potentially be harmful if used improperly."
(Manley Aff. ¶ 20).

During his medical suspension, Plaintiff emailed the Human Resources Director requesting transfer to the Prince George's Division. Plaintiff alleged that the "request is the direct result of the continued harassment and retaliation [Plaintiff] endured" from McSwain and Murphy. (ECF 129-31). Specifically, Plaintiff alleged that his medical suspension was created to harass him, and he was embarrassed when Park Police staff went to his residence to seize his police credentials and equipment in front of his family. (*Id.*) McSwain approved the transfer, but the Chief for the Prince George's County Division denied it at the time. (McSwain Dep. 141:7–11). Plaintiff was eventually transferred to the Prince George's County Division in April 2021, "effectively removing him from the supervisory reach of Riley and McSwain." (Spencer Aff. ¶ 28).

## II.    Procedural History

Plaintiff received a right-to-sue notice from EEOC on June 14, 2019, and filed the original Complaint in this matter on September 11, 2019. (ECF 1). Plaintiff filed an Amended Complaint in December 2019, (ECF 15), and successfully sought leave to file a Second Amended Complaint in January 2020 (ECF 22). After Defendants jointly moved to dismiss the Second Amended Complaint pursuant to Rule 12(b) (ECF 23), Plaintiff filed a motion for leave to file the Third Amended Complaint (ECF 28), which was granted on March 20, 2020.

The Third Amended Complaint contains fifteen counts. (ECF 29). Defendants filed a joint motion to dismiss the Third Amended Complaint. (ECF 38). The Honorable Theodore D. Chuang, District Judge, granted the motion in part, dismissing Plaintiff's claims for retaliation under the First Amendment, procedural due process, and race discrimination. (ECF 45; ECF 46). Judge Chuang denied the motion as to the following

claims:

> (1)    Count I: Hostile Work Environment, pursuant to the Civil Rights Act [42 U.S.C. § 1981], against all Individual Defendants in their individual capacities only;

> (2)    Count II: Hostile Work Environment, pursuant to Title VII [42 U.S.C. §§ 2000e-2], against MNCPPC only;

> (3)    Count III: Retaliation, pursuant to Title VII [42 U.S.C. §§ 2000e-3], against MNCPPC only;

> (4)    Count VI: Due Process (substantive due process claim only), pursuant to the Civil Rights Act [42 U.S.C. § 1983], against all Individual Defendants in their individual capacities only;

> (5)    Count X: Hostile Work Environment, pursuant to Maryland Fair Employment Practice Act [Md. Code, State Gov't, § 20-606], against MNCPPC only;

> (6)    Count XI: Due Process (substantive due process claim only), pursuant to Maryland Const. Art. 24 and 26, against all Defendants;

> (7)    Count XIII: Negligent Training, Retention & Supervision, against MNCPPC only;

> (8)    Count XIV: Negligence, against all Individual Defendants in their individual capacities and against MNCPPC as Indemnor under the Local Government Tort Claims Act ("LGTCA"); and

> (9)    Count XV: Gross Negligence (in the alternative), against all Individual Defendants in their individual capacities and against MNCPPC as Indemnor under LGTCA.

Defendants have moved for summary judgment as to each of these remaining counts. (ECF 106-1 at 7).

## III.    <u>Legal Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant a party's summary judgment motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*,

31

954 F.3d 162, 168 (4th Cir. 2020). To avoid summary judgment, the non-moving party

must demonstrate that there is a genuine dispute of material fact so as to preclude the award

of summary judgment. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *see also*

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986);

*Gordon v. CIGNA Corp*., 890 F.3d 463, 470 (4th Cir. 2018). "[T]he mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing

law[,]" and a genuine issue as to material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at

248; *see also Sharif v. United Airlines*, *Inc*., 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v.*

*Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308,

313 (4th Cir. 2013). A party can establish the absence or presence of a genuinely disputed

fact through "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those

made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Fed. R. Civ. P. 56(c)(1)(A).

To defeat the motion for summary judgment, "the opposing party must set forth

specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co*.,

936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). "Unsupported

speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-*

*Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987). "The mere existence of a scintilla of

evidence in support of the plaintiff's position" is likewise insufficient to overcome a defendant's motion for summary judgment. *Anderson*, 477 U.S. at 252. A plaintiff opposing summary judgment must present "evidence on which the jury could reasonably find for the plaintiff." *Id.*

Summary judgment is proper if "a party fails to establish the existence of an element essential to that party's case" or "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Perkins*, 936 F.3d at 205 (quoting *Teamsters Joint Council No. 83 v. Centra, Inc*., 947 F.2d 115, 119 (4th Cir. 1991)). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. Ltd*., 475 U.S. at 587, but the court is not to weigh the evidence, make credibility determinations, or decide the truth of disputed facts, *Anderson*, 477 U.S. at 249; *see also Wilson v. Prince George's Cty*., 893 F.3d 213, 218-19 (4th Cir. 2018); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Ordinarily, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).

**IV.**      <u>**Analysis**</u>

A. <u>Relevant Anti-Discrimination Statutes</u>

Plaintiff asserts a claim in Count I against Individual Defendants for hostile work

environment under 42 U.S.C. § 1981 ("Section 1981"), and claims in Counts II, III, and X

against MNCPPC for hostile work environment and retaliation under Title VII of the Civil

Rights Act of 1964 ("Title VII") and hostile work environment under the Maryland Fair

Employment Practices Act ("MFEPA"), respectively.

Title VII provides a cause of action against employers for discrimination "against

any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin[.]"

42 U.S.C. § 2000e-2(a)(1). This provision is sometimes called as the "anti-discrimination"

provision, and claims against an employer for a racially hostile work environment fall

under this provision. *Perkins v. Int'l Paper Co*., 936 F.3d 196, 205–06 (4th Cir. 2019).

Title VII also prohibits discrimination based on an employee's opposition to practices

prohibited by Title VII or participation in any Title VII investigation, proceeding, or

hearing. 42 U.S.C. § 2000e-3. This provision is sometimes called the "anti-retaliation"

provision, and claims that an employer retaliated against an individual for engaging in

protected opposition or participation activities fall under this provision. *Perkins*, 936 F.3d

at 205–06.

A plaintiff has two potential avenues to avoid summary judgment on a Title VII

claims for discrimination or retaliation. *Diamond v. Colonial Life & Acc. Ins. Co*., 416 F.3d

310, 318 (4th Cir. 2005); *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th

Cir. 2015). First, the plaintiff may present direct or circumstantial evidence that creates a

genuine issue of material fact as to whether an impermissible factor, such as the plaintiff's

race or protected activity, motivated the employer's adverse conduct. *Id*. Alternatively, the

plaintiff may proceed under a burden-shifting framework derived from *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), which is comprised of three steps:

> [T]he plaintiff-employee must first prove a prima facie case of [his discrimination or retaliation claim] by a preponderance of the evidence. If [he] succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

*Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004). Despite the burden-shifting nature

of this process, the "ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d 756, 778 (D. Md. 2020).

MFEPA similarly prohibits certain employers in Maryland from discriminating

against individuals "with respect to the individual's compensation, terms, conditions, or

privileges of employment because of … the individual's race" or various other protected

classifications. Md. Code, State Gov't § 20-606(a)(1)(1)(i). "Maryland courts interpreting

MFEPA have often found federal cases arising under Title VII to be persuasive authority."

*Brown v. Bratton*, No. ELH-19-1450, 2020 WL 886142, at *26 (D. Md. Feb. 21, 2020)

(citing cases); *see also Alexander v. Marriott Int'l, Inc.*, RWT–09–02402, 2011 WL

1231029, at *6 (D. Md. Mar. 29, 2011) ("[MFEPA] is the state law analogue of Title VII.").

Section 1981 also "prohibits discrimination in employment on the basis of race."

*Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551-52 (4th Cir. 2006); *see Johnson*

*v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy

against discrimination ... on the basis of race."). The statute creates a cause of action for

race-based hostile work environments. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369,

373 (2004) (addressing hostile work environment claim brought pursuant to § 1981).

Unlike Title VII, under Section 1981, "[d]irectors or managers can be held personally liable when they 'intentionally cause [an employer] to infringe the rights secured by' section 1981." *Carson v. Giant Food, Inc*., 187 F. Supp. 2d 462, 483 (D. Md. 2002) (quoting *Tillman v. Wheaton–Haven Recreation Ass'n*, 517 F.2d 1141, 1145 (4th Cir. 1975)).

### B. Supervisory Authority

In their Motion for Summary Judgment, Defendants first raise the issue of supervisory authority as to Uhrig, Murphy, and McSwain.[30] Under Title VII, a "supervisor," for purposes of imputing liability to an employer, is an individual who is empowered "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ*., 570 U.S. 421, 431 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Uhrig was in Plaintiff's chain of command as his second line supervisor from June 2013 to October 2013 and from June 2014 to May 2015. He did not directly or indirectly supervise Plaintiff outside these two periods, and he retired from Park Police in August 2017. Murphy was in Plaintiff's chain of command as his first line supervisor from December 21, 2014, to April 10, 2015. He did not directly or indirectly supervise Plaintiff outside of this time frame. Between February 2016 and August 2018, Murphy and Plaintiff were of equal rank. (ECF 106-1 at 11).

Plaintiff suggests that Uhrig and Murphy should be considered his supervisors by

---

[30] Although the issue was discussed in Judge Chuang's opinion based on allegations in the Third Amended Complaint, the matter must now be revisited in view of the evidence upon Defendants' motion for summary judgment.

virtue of holding a higher rank than him, even when they were not in his chain of command. (ECF 129-1 at 3–4; ECF 140 at 47–49). But Plaintiff fails to provide any evidence to support that proposition that either Uhrig or Murphy was in a position to take tangible employment actions against Plaintiff during times when they were not in his direct chain of command. While there are instances in the Park Police in which a higher-ranking officer outside the direct chain of command can give a lawful order that must be obeyed by lower-ranking officers (Manley Aff. ¶ 13), there is no evidence that either Uhrig or Murphy ever gave Plaintiff such an order when he was outside their direct chain of command (Evans Dep. 413:1–415:2).

On May 7, 2018, McSwain began working for MNCPPC as the Chief of the Montgomery County Division, and he was in Plaintiff's chain of command until Plaintiff transferred to the Prince George's County Division in April 2021. McSwain was Plaintiff's supervisor from May 7, 2018, to April 2021 for purposes of Plaintiff's claims.

Riley has been the Director of Montgomery County Parks Department since 2014. Although not involved in the day-to-day operation of Park Police, Riley authorized investigation into allegations concerning Plaintiff's conduct and was in a position to influence tangible employment actions against Plaintiff. (*See, e.g.*, ECF 107-6; ECF 107-8). Thus, Riley is deemed a supervisor Plaintiff from 2014 to 2021 for purposes of the Title VII and related claims.

C. Hostile Work Environment: Counts I, II, and X

Plaintiff's claims for hostile work environment are brought under Title VII, 42 U.S.C. § 2000e-2; MFEPA, Md. Code, State Gov't § 20-606; and 42 U.S.C. § 1981. "An employer contravenes [42 U.S.C.] § 2000e-2(a)(1) by, inter alia, requiring an African–

37

American employee to work in a racially hostile environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)). The MFEPA "is the state law analogue of Title VII." *Alexander*, 2011 WL 1231029, at *6; *see also Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 743 n. 8 (Md. 2007). The Court will apply the standards for a Title VII hostile work environment claim to the merits of Plaintiff's hostile work environment claims under Section 1981 and the MFEPA. *See Boyer-Liberto*, 786 F.3d at 277 ("The same test applies to a hostile work environment claim asserted under 42 U.S.C. § 1981" as applied to a Title VII racially hostile work environment claim); *Brown*, 2020 WL 886142, at *13, *26 (applying Title VII standards to Section 1981 and MFEPA claims); (ECF 45 at 9) (same).

Different statutes of limitations apply to each of Plaintiff's hostile work environment claims. Plaintiff's § 1981 hostile work environment claim against Individual Defendants must be founded on acts that occurred on or after September 11, 2015, based upon a four-year statute of limitations. (ECF 45 at 8) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004)). Plaintiff's MFEPA hostile work environment claim against MNCPPC must be founded on acts that occurred on or after September 11, 2017, based upon a two-year statute of limitations. *See McCleary-Evans v. Maryland Dep't of Transp.*, No. ELH-12-1550, 2015 WL 1285325, at *22 (D. Md. Mar. 20, 2015), *aff'd*, 631 F. App'x 178 (4th Cir. 2016) (stating that the civil action under MFEPA must be "filed within 2 years after the alleged unlawful employment practice occurred"). Plaintiff's Title VII hostile work environment claim against MNCPPC must be founded on acts that occurred on or after February 20, 2018, based upon a 300-day limitations period prior to the date Plaintiff filed his EEOC charge. (ECF 45 at 7) (citing *Nat'l R.R. Passenger Corp.*

38

*v. Morgan*, 536 U.S. 101, 105 (2002)).

However, "[u]nlike claims for disparate treatment and retaliation, the continuing violation doctrine applies to a hostile work environment claim." *Perkins*, 936 F.3d at 209 (citing *Morgan*, 536 U.S. at 116–17, and *Guessous*, 828 F.3d at 223, n.5). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 116–17. "In determining whether an actionable hostile work environment claim exists, [a court] look[s] to 'all the circumstances,'" and "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability." *Id.* "In other words, even if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period." *Guessous*, 828 F.3d at 222.

A hostile work environment exists "[w]hen 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 407 (4th Cir. 2022) (quoting *Boyer-Liberto*, 786 F.3d at 277). To establish a *prima facie* claim of hostile work environment based on race, a plaintiff must demonstrate the following: "(1) he experienced unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Perkins*,

936 F.3d at 207–08 (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)). The final element does not apply to hostile work environment claims brought under Section 1981. (ECF 45 at 16).

For reasons explained below, Plaintiff fails to establish any *prima facie* claim of hostile work environment, and Defendant is entitled to summary judgment on each of the claims stated in Counts I, II, and X.

      a.  <u>Unwelcome Conduct</u>

"The gravamen of any hostile work environment claim is that the harassment was unwelcome." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008) (citing *Meritor Sav. Bank*, 477 U.S. at 68). Establishing unwelcome conduct "is not a high hurdle." *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018). "[A]n employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer," and "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* at 328–29.

Plaintiff's hostile work environment claim is supported by evidence that, while serving as Plaintiff's second line supervisor, Uhrig directed Plaintiff's first line supervisors not to treat him as as a supervisor of the K-9 program, denied Plaintiff's requests for particular work equipment and a training opportunity, and directed that Plaintiff receive work performance counseling for a reimbursement request Plaintiff made. Plaintiff also complains that Uhrig discussed Plaintiff's friendship with DeVaul with Plaintiff's first line supervisors, indicated that Plaintiff may circumvent the chain of command and should not be permitted to do so, and scrutinized and frustrated Plaintiff's work schedule.

Plaintiff claims that Murphy also frustrated Plaintiff's work schedule, training

opportunities, and requests for work equipment, and that he conducted the work performance counseling directed by Uhrig. Additionally, Murphy included derogatory comments in his exit evaluation of Plaintiff's work performance and reported allegations of timekeeping fraud by Plaintiff, which Murphy had discussed with Uhrig. Murphy's allegations about Plaintiff reached Riley and contributed to multiple workplace investigations of Plaintiff's conduct.

As to McSwain, Plaintiff also points to McSwain's issuance of a "medical suspension" of Plaintiff and direction that his police credentials and equipment be seized in connection with the suspension.

Plaintiff's complaints to MNCPPC leadership and human resources about the foregoing conduct by Defendants shows that the conduct was unwelcome, and record evidence shows that at least some of the foregoing unwelcome acts occurred within the limitations periods applicable to Plaintiff's hostile work environment claims.

b. Based on Race

To satisfy the second element of a *prima facie* hostile work environment claim, the plaintiff must demonstrate that the unwelcome conduct he endured was "because of" his protected class. 42 U.S.C. § 2000e–2. "To establish that harassment was based on race, [the plaintiff] must show that but for [his] race, [he] would not have been the victim of the alleged discrimination." *McIver*, 42 F.4th at 409 (quoting *Gilliam v. S.C. Dep't of Juv. Justice*, 474 F.3d 134, 142 (4th Cir. 2007)). "[H]arassment due to personality conflicts will not suffice." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

i. Riley, McSwain, and Murphy

Plaintiff fails to cite any admissible evidence demonstrating or supporting a

41

reasonable inference that Riley, McSwain, or Murphy harassed Plaintiff "because of" his race or harbored any racial animus when they engaged in conduct Plaintiff claims was unwelcome. Plaintiff relies primarily upon the proposition that race-based cliques or a culture characterized by a racial divide existed at the Montgomery County Division. Witnesses have testified to the existence of social circles at the Montgomery County Division reflecting a racial divide, and the HRX report that issued in June 2018 noted the same, among other problems with the workplace culture. But the Court has been presented no evidence that the mere existence of these cliques resulted in any harassment of Plaintiff. There is no evidence to suggest that Riley or McSwain were members of any social clique at the workplace or treated any such group better than any other in any way that affected Plaintiff or resulted in his harassment. Even assuming there was sufficient evidence to support an inference that Murphy and Uhrig were part of a predominantly Caucasian social group at the workplace, any such membership would be inadequate to attribute any unwelcome treatment directed toward Plaintiff to race-based motivations. *See Sivells v. Sam's Club*, No. CV147650KMMAH, 2017 WL 3151246, at *6 (D.N.J. July 25, 2017) (membership in a social clique without more does not suggest discriminatory intent).

The Court has been presented with no evidence that any unwelcome treatment Plaintiff received from Riley or McSwain was motivated by race. Plaintiff has failed to present any evidence of racially disparate treatment with respect to the workplace misconduct investigations he attributes to MNCPPC and Riley in his individual capacity. And there is no evidence that Plaintiff was treated differently than other similarly situated officers with respect to the suspension of his police powers in March 2019 after he suffered a head injury. McSwain testified that two Caucasian officers also had credentials and work

equipment seized as a result of medical issues in November and December 2018. One of the officers was placed on a "medical suspension," although the other was able to continue work with accommodations because she only injured her hand.[31]

Similarly, Plaintiff offers no evidence that any unwelcome treatment he received from Murphy was based on any racial motivation or bias by Murphy. First, any allegation that Murphy used racial slurs in the workplace is not supported by any admissible evidence in the record. Second, much of the unwelcome treatment Plaintiff attributes to Murphy was done at Uhrig's direction while Murphy worked under Uhrig's management, including work performance counseling Plaintiff received in 2015, scheduling Plaintiff to work multiple work shifts, and efforts to deny Plaintiff at least one training opportunity. Notably, Murphy *approved* Plaintiff for the training, but Uhrig later sought to deny it before the training was ultimately approved by DeVaul. The unwelcome treatment against Plaintiff for which Murphy *was* responsible included negative remarks about Plaintiff's work performance during an exit evaluation, scrutiny over a requisition request Plaintiff made for dog food purchases, and allegations that Plaintiff violated workplace policies. The Court has been presented with no evidence of any racial disparity related to this conduct or any other indication that the conduct was racially motivated. To the contrary, as to the policy violations, Plaintiff was but one of seven officers Murphy accused of workplace fraud, waste, and abuse, and three of the other officers were Caucasian.

Plaintiff argues that the circumstances under which the 2015 workplace performance counseling was issued to him demonstrates disparate treatment between him

---

[31]     A third Caucasian officer did not have his police credentials or equipment seized for a period of time while he was on medical leave, apparently due to an oversight and mistaken belief by McSwain that the officer had immediately returned to work.

and "similarly situated white men." (ECF 129-1 at 50). The comparators Plaintiff is referring to are Murphy and Uhrig, the very supervisors who issued the counseling. The counseling was ordered by Uhrig, ostensibly based upon Plaintiff's violation of a policy that required him to request approval for work-related petty cash expenditures before making purchases. Plaintiff argues that Murphy and Uhrig violated the same policy he was counseled for violating when they approved his reimbursement requests. Plaintiff's argument is unpersuasive. Murphy and Uhrig were not "similarly situated" to Plaintiff because they had not made work-related purchases without first obtaining approval, as required by departmental policy.

Given the lack of any genuine dispute of material fact as to whether any unwelcome conduct by Riley, McSwain, or Murphy was based on Plaintiff's race, each of these defendants is entitled to summary judgment on Plaintiff's Section 1981 hostile work environment claim (Count I).

### ii. Uhrig

As to Uhrig, Plaintiff has presented evidence that, viewed in the light most favorable to Plaintiff, may support a reasonable inference that unwelcome conduct Plaintiff received from Uhrig was based on Plaintiff's race. Adams, Plaintiff's first-line supervisor in 2013, testified that Uhrig raised more issues with her about Plaintiff than he did for other officers under her supervision, who were Caucasian. Witnesses have also indicated that Uhrig scrutinized and frustrated Plaintiff's work schedule in 2014 and did not treat other officers the same way.

In addition to the foregoing evidence of racially disparate treatment by Uhrig, Plaintiff cites emails with racially and culturally offensive content that were transmitted

between Uhrig and other officers in the Montgomery County Division. The offensive emails in question were exchanged on isolated dates within a period of nearly one year, between September 2014 and August 2015. The only officer who both was a party to these emails and is accused of race-based harassment of Plaintiff in this litigation is Uhrig. First, on September 5, 2014, Uhrig received an email containing a hyperlink to a photo (not actually displayed in the email) with a description of the photo that referred to individuals "grab[bing] their crotch" and "put[ting] their hands down their pants," calling this behavior "ghetto mandatory." (ECF 129-18 at 2). In a reply email, Uhrig stated, "Stop taping Brownlee's kids," which was an apparent reference to the Chief of the Prince George's County Division, who was African American. Second, on January 2, 2015, Uhrig participated in an exchange of emails disparaging Philipose, an officer of Indian descent, with offensive comments about the smell of Philipose's office, "play[ing] Cowboys and Indians," and "win[ning] the war" against "Indians." (ECF 129-16). Third, on July 29, 2015, Uhrig sent an email to another officer stating, "Clearly on CP time," which apparently attributed a delay in the processing of the other officer's payroll-related paperwork to "colored people's time." (ECF 129-17).

Although Uhrig was Plaintiff's second line supervisor during the period the first two of the foregoing three emails were exchanged, Plaintiff was not a recipient of any of the emails. The Court has been presented with no evidence that any other recipient of any of the foregoing emails was African American or non-white.[32] Furthermore, there is no

---

[32] The Court has been presented a fourth email, dated August 24, 2015, that Uhrig received from DeVaul, his African American supervisor. The email does not include any statement or commentary by Uhrig. The email sent by DeVaul displays a photo of women, who appear to be Latina, wearing bandanas on their faces and carrying handguns. The subject line of the email reads, "Girls (Patty) in the hood. Don't mess with Wheeeeeetoon!," which may be a reference to the Latino community in Wheaton, Maryland.

evidence that Riley, Uhrig's supervisor, was aware of the emails at the time and failed to take corrective action against the racially offensive communications. Plaintiff did not become aware of the emails until sometime after Uhrig was no longer in his chain of command, and he did not actually see the emails until they were disclosed in discovery in the instant litigation.

Considered in combination with testimony that Plaintiff received racially disparate treatment from Uhrig while under his supervision, the racially offensive content of the foregoing emails could create a genuine dispute as to whether Uhrig harbored a racial bias sufficient to support an inference that his unwelcome treatment of Plaintiff was racially motivated. *See Brown v. Bratton*, No. 1:19-CV-01450-JMC, 2021 WL 3510578, at *8 (D. Md. Aug. 10, 2021), *aff'd*, No. 21-1998, 2022 WL 17336572 (4th Cir. Nov. 30, 2022) (concluding that, with a view of the evidence in the light most favorable to the plaintiff, racially disparaging comments in the workplace could satisfy the second element of a hostile work environment claim, even when the plaintiff did not hear and was not aware of the comments).

### c.  Severe or Pervasive

Turning to the third element of Plaintiff's hostile work environment claims, the question becomes whether there is any genuine dispute as to whether Plaintiff endured racially motivated harassment from Uhrig that was "sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment.'"[33] *McIver*, 42 F.4th at 407 (quoting *Boyer-Liberto*, 786 F.3d at 277) (emphasis added).

---

[33]    Given the lack of any evidence that any unwelcome conduct Riley, McSwain, or Murphy directed to Plaintiff was racially motivated, the Court need not reach the question of whether any of their unwelcome conduct was severe or pervasive.

The "severe or pervasive" requirement has both subjective and objective components. *See Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 21–22 (1993); *Perkins*, 936 F.3d at 207–08; *Strothers*, 895 F.3d at 331. "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). A plaintiff "must clear a high bar in order to satisfy the [objective] severe or pervasive test." *Perkins*, 936 F.3d at 208. "[W]hen determining whether the harassing conduct was objectively severe or pervasive," a court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Sunbelt*, 521 F.3d at 315-16). The "severe and pervasive" analysis is not, and "by its nature cannot be, a mathematically precise test." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). However, "[a] discriminatorily abusive work environment ... can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22.

"The standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Perkins*, 936 F.3d at 208. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Perkins*, 936 F.3d at 208 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Likewise, the "[m]ere utterance of an ... epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment[.]" *Boyer-Liberto*, 786 F.3d at 277

47

(quoting *Harris*, 510 U.S. at 21). And "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Sunbelt Rentals*, 521 F.3d at 315–16 (internal quotation marks and citations omitted).

Here, the relevant limitations period for Plaintiff's Section 1981 hostile work environment claim began on September 11, 2015, by which point Uhrig was no longer in Plaintiff's supervisory chain of command. Uhrig retired from MNCPPC in August 2017, before the limitations periods for Plaintiff's hostile work environment claims against MNCPPC even began. The limitations period for the Title VII claim begins on February 20, 2018, and the limitations period for the MFEPA claim begins on September 11, 2017.

Plaintiff has failed to present any genuine dispute of material fact that unwelcome conduct he endured from Uhrig during the relevant limitations period was not objectively severe and pervasive enough to alter the conditions of his employment or create an abusive atmosphere. Even considering Uhrig's unwelcome acts that preceded the limitations periods, Plaintiff fails to clear the "high bar" of showing that Uhrig's conduct toward Plaintiff was objectively severe and pervasive. *Perkins*, 936 F.3d at 208.

First, the record before the Court does not support any reasonable inference that Uhrig's racially offensive emails constituted harassment of Plaintiff so severe or pervasive that it altered his conditions of employment or created an abusive work environment for him. The email chains in question were four in number, dated between September 2014 and August 2015, and were not directed to Plaintiff. He did not even know the emails existed until after he was no longer supervised by Uhrig, and he did not actually see the emails until they were produced in discovery in the instant litigation. While "evidence of

48

racially offensive conduct that [Plaintiff] heard about second-hand should not be disregarded simply because he did not witness it," *Perkins*, 936 F.3d at 210, "second-hand harassment, although relevant, is less objectively abusive than harassment directed only at the plaintiff." *Sraver v. Surgical Monitoring Servs., Inc*., Civ. No. CCB-05-1331, 2006 WL 2190727, at *5 (D. Md. July 27, 2006) (citation omitted) (citing *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753–54 (4th Cir.1996)); *see also Brown v. Bratton*, No. 1:19-CV-01450-JMC, 2021 WL 3510578, at *10 (D. Md. Aug. 10, 2021), *aff'd*, No. 21-1998, 2022 WL 17336572 (4th Cir. Nov. 30, 2022) ("[T]he impact of this second-hand harassment, for purposes of determining if the harassment was objectively hostile or abusive, is not as great as that of harassment directed at Plaintiff."). Plaintiff fails to identify any impact this small number of emails had on his conditions of employment or work environment during the limitations period or any other point in time.

The only unwelcome act by Uhrig that was in any way related to Plaintiff on or after September 11, 2015, are discussions he had with Murphy about Murphy potentially submitting a complaint against Plaintiff, among others, for workplace misconduct. Plaintiff has presented no evidence that these discussions concerned Plaintiff's race or that the discussions were "severe or pervasive" by any measure. They did not occur in Plaintiff's presence, and the Court is not aware of any evidence that Plaintiff even knew about them when they occurred. There is no evidence that Uhrig caused, or even encouraged, Murphy to file the complaint he ultimately submitted to MNCPPC, the investigations of Plaintiff's conduct that followed, or any action that could have altered the conditions of Plaintiff's employment or created an abusive work environment for him. Indeed, Uhrig was retired at the time Murphy consulted him about his allegations against Plaintiff before submitting his

49

complaint. Uhrig was not in a position to direct Murphy to do anything or to affect MNCPPC's response to Murphy's allegations in any way.[34]

What unwelcome acts Uhrig committed before the limitations period do not render severe or pervasive any unwelcome acts Plaintiff endured during the limitations period. Viewed in the light most favorable to Plaintiff, Uhrig committed the following unwelcome acts while Plaintiff was under his supervision, before the limitations period:

1) In or around June 2013, Uhrig told Plaintiff's first line supervisor that Plaintiff and DeVaul were friends and that Plaintiff had a habit of circumventing the chain of command while he was in the Prince George's County Division.

2) During the same period, Uhrig denied to Plaintiff's first line supervisor that Plaintiff was a supervisor of the K-9 program, which prevented the supervisor from delegating certain matters to Plaintiff.

3) In or around July 2013, Uhrig denied Plaintiff's request to install center caps on his assigned cruiser. Uhrig also scrutinized Plaintiff's request to have windows on his cruiser tinted.

4) In or around September 2013, Uhrig advised Plaintiff's new first line supervisor about Plaintiff's friendship with DeVaul and told him to ensure that Plaintiff followed the chain of command.

5) Uhrig also told the new first line supervisor that Plaintiff was not the K-9 supervisor, denied the supervisor's request to assign certain tasks to Plaintiff, and generally

---

[34] The fact that Uhrig was no longer Plaintiff's supervisor, and was retired from Park Police, during the limitations period applicable to the Title VII and MFEPA hostile work environment claims against MNCPPC undermines imputing liability to MNCPCC for any harassing conduct Uhrig committed. Uhrig ceased being Plaintiff's supervisor in May 2015 and retired in August 2017. The limitations period for Plaintiff's MFEPA claim began in September 2017, while the limitations period for his Title VII claims began in February 2018.

scrutinized the K-9 program.

6) In or around June 2014, Uhrig noted to Philipose, then Plaintiff's first line supervisor, that Plaintiff and DeVaul were friends and told Philipose to ensure that Plaintiff followed the chain of command.

7) During this period, Uhrig also scrutinized Plaintiff's work schedule and leave from work. Thereafter, Plaintiff's work schedule continued to be an issue between Uhrig and Plaintiff.

8) In or around January 2015, Uhrig denied Plaintiff's request to attend training for handling bomb-sniffing dogs. DeVaul later approved Plaintiff for this training.

9) In or around February 2015, Uhrig directed that Plaintiff receive counseling for making a reimbursement request for unauthorized work-related purchases.

Whether or not the above listed unwelcome acts by Uhrig were sufficiently severe or pervasive to create an abusive work environment for Plaintiff when they occurred, the Court has been presented with no evidence that any of these acts continued during the limitations period or any point after Uhrig ceased serving in Plaintiff's chain of command. Because these acts were not repeated or otherwise connected to any unwelcome treatment Plaintiff received on or after September 11, 2015, they cannot support any of his hostile work environment claims. *See McIver*, 42 F.4th at 407 ("[A] hostile-work-environment claim's "very nature involves repeated conduct.") (quoting *Morgan*, 536 U.S. at 115).

Finally, there does not appear to be any evidence that any conduct by Uhrig, or any other defendant for that matter, interfered with Plaintiff's work performance or career advancement, within or outside the applicable limitations period.

For the foregoing reasons, Uhrig is entitled to summary judgment on Plaintiff's

Section 1981 hostile work environment claim against him (Count I). Given the lack of any evidence that Plaintiff suffered any sufficiently severe or pervasive race-based harassment on or after September 11, 2017, MNCPPC is also entitled to summary judgment on Plaintiff's hostile work environment claims under Title VII and MFEPA (Counts II and X).

    D.  <u>Title VII Retaliation: Count III</u>

Plaintiff asserts a claim against MNCPPC for retaliation under Title VII. Title VII expressly prohibits retaliation by an employer against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]," or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). A *prima facie* case of retaliation under Title VII requires proof that (1) the plaintiff engaged in "protected activity," (2) the plaintiff suffered a "materially adverse" action, and (3) there was a "causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co*., 936 F.3d 183, 195 (4th Cir. 2019) (citing *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 61–68 (2006)).

If the plaintiff "establish[es] a *prima facie* case of retaliation, the burden shifts to the [employer] to articulate a legitimate, non-retaliatory reason for the adverse employment action." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000)). If the employer meets this burden of production, the plaintiff must prove by a preponderance of the evidence that the

defendant's articulated reasons are a mere pretext for retaliation. *Id.* at 726; *see also Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 210 (4th Cir. 2014) (applying *McDonnell Douglas* framework to Title VII retaliation claim). Despite this burden-shifting framework, "[t]he ultimate burden of persuading the trier of fact remains with the employee at all times." *Westmoreland*, 924 F.3d at 726 (internal quotation marks omitted).

Plaintiff's Title VII retaliation claim must be based on the discrete acts that occurred on or after February 20, 2018, based upon the 300-day limitations period prior to the date Plaintiff filed his EEOC charge. (ECF 45 at 7).

### a. Protected Activity

"Protected activities under Title VII include both participation and opposition activities." *McIver*, 42 F.4th at 411 (citing *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 257 (4th Cir. 1998)). Participation activities include filing a charge of workplace race discrimination with EEOC or otherwise assisting or participating in an investigation or proceeding under Title VII. *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994). The Fourth Circuit has taken "an expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Laughlin*, 149 F.3d at 259). However, "[n]ot all employee complaints are protected by Title VII's retaliation provision," and the '[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races.'" *McIver*, 42 F.4th at 411 (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000); *see also Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D. Md. 2018) ("Complaints about management activities

that would not constitute unlawful discrimination do not count as protected activity."); *Bowman v. Baltimore City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) ("General complaints of unfair treatment are not protected activity.").

Plaintiff identifies as protected activities both his internal complaint against Uhrig and Murphy he submitted in 2015 and an EEOC charge he filed in 2018. The 2018 EEOC charge was clearly activity protected under Title VII. The parties dispute whether there is any evidence to show that the 2015 internal complaint constitutes a protected activity under Title VII. The 2015 internal complaint generally alleged that Plaintiff received unfair treatment, targeting, biases and false allegations from Uhrig while he was Plaintiff's second line supervisor. Defendants argue that Plaintiff's 2015 internal complaint was not a Title VII protected activity because it did not include any allegations of discrimination based on race. Indeed, the document is eight, single-spaced pages in length and provides a detailed account of Plaintiff's grievances, but at no point does it allege racial discrimination or even mention Plaintiff's race. Subsequent complaints that Plaintiff submitted against Murphy were incorporated into the internal investigation prompted by Plaintiff's 2015 complaint. These complaints extended Plaintiff's complaints of unfair treatment and false allegations to Murphy, and at least one such complained alleged retaliation and "continuation of discrimination," but there was no mention among these complaints of any racial discrimination or bias by either Murphy or Uhrig.

Plaintiff argues that the context in which the 2015 complaint was submitted and the report subsequently produced by Skaife after her investigation of the complaint shows that the initial complaint alleged race discrimination. It is unclear what "context" Plaintiff is referring to, and he fails to identify evidence of any circumstance surrounding the initial

complaint to suggest that it was intended or should have been interpreted to convey allegations of race discrimination. Skaife's report does reflect that she investigated an allegation that Uhrig treated Plaintiff unfairly based on his race, an allegation that was ultimately not sustained through the investigation, but there is no admissible evidence to show that this allegation was derived from Plaintiff's complaint. The Court finds no genuine dispute that Plaintiff's 2015 internal complaint was not a complaint of race discrimination and therefore not protected activity under Title VII.

However, even if both the 2015 internal complaint and the 2018 EEOC complaint were found to be Title VII protected activities, Plaintiff offers insufficient evidence to support a reasonable inference that he suffered any materially adverse action that was caused by either protected activity.

### b. Materially Adverse Action and Causal Connection

To prove his retaliation claim, Plaintiff must show a materially adverse action taken by his employer was causally connected to his protected activity. *Perkins*, 936 F.3d at 213 (citing *Burlington Northern*, 548 U.S. at 61–68). "An employer is liable for retaliation only if the person with retaliatory animus 'can be deemed a decisionmaker for, or agent of' the employer taking adverse action against the employee." *McClain v. Lynchburg City Sch.*, 531 F. Supp. 3d 1115, 1130–31 (W.D. Va. 2021) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004)). The employer's conduct must be such that "a reasonable employee would have found the challenged action[s] materially adverse," that is, sufficient to dissuade a reasonable employee from engaging in protected activity. *Burlington Northern*, 548 U.S. at 68; *see also Strothers*, 895 F.3d at 327.

The adverse action necessary to sustain a retaliation claim "need not affect the terms

and conditions of employment." *Barnes v. Charles Cnty. Pub. Schools*, 747 Fed. App'x

115, 119 (4th Cir. 2018) (per curiam) (citing *Burlington Northern*, 548 U.S. at 64); *see also*

*Strothers*, 895 F.3d 317, at 327 n.3. But the challenged conduct must impose "some direct

or indirect impact on an individual's employment as opposed to harms immaterially related

to it." *Barnes*, 747 Fed. App'x at 119 (quoting *Adams v. Anne Arundel Cnty. Pub. Schs*.,

789 F.3d 422, 431 (4th Cir. 2015)). A "discharge, demotion, decrease in pay or benefits,

loss of job title or supervisory responsibility, or reduced opportunities for promotion"

constitute adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Conduct

such as "failing to issue a performance appraisal ... or issuing a personal improvement

plan" or a verbal or written reprimand, without more, do not constitute materially adverse

actions in support of a retaliation claim. *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F.

Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted). As noted in Part IV.C *supra*,

Title VII does not serve as "a general civility code for the American workplace."

*Burlington Northern*, 548 U.S. at 68. "The anti-retaliation provision of Title VII does not

protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist*

*v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington*

*Northern*, 548 U.S. at 68). Nor does "a personal conflict alone ... constitute retaliation."

*Spencer v. Va. State Univ*., 919 F.3d 199, 208 (4th Cir. 2019).

To establish causation under Title VII, the plaintiff bears the burden of establishing

that the alleged retaliation "would not have occurred in the absence of the alleged wrongful

action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani v. Palmetto*

*Health*, 767 F. App'x 399, 421 (4th Cir. 2019). "A plaintiff may attempt to demonstrate

that a protected activity caused an adverse action through two routes." *Roberts v. Glenn*

*Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (citation omitted). "A plaintiff may establish the existence of facts that suggest that the adverse action occurred because of the protected activity." *Roberts*, 998 F.3d at 123 (cleaned up). A plaintiff may also demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Id*. While "temporal proximity suffices to show a causal relationship," *Sempowich*, 19 F.4th at 654, a "lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse ... action" often "negates any inference that a causal connection exists between the two." *Constantine*, 411 F.3d at 501 (citation omitted). And "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King*, 328 F.3d at 151 n. 5).

To establish a causal relationship between the protected activity and adverse action, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts*, 998 F.3d at 124; *see Dowe*, 145 F.3d at 657. As a result, if the "decisionmaker is unaware of any prior complaints, a plaintiff 'cannot establish the necessary causal connection.'" *Roberts*, 998 F.3d at 124. Constructive knowledge is not sufficient, but actual knowledge is required. *Id*. at 125.

The adverse actions Plaintiff claims were made in retaliation for his protected activity include Murphy's internal complaint in 2017 that Plaintiff (among other officers) committed fraud, waste, and abuse; Riley's authorization of investigations into Plaintiff's alleged misconduct; and McSwain's decision to suspend Plaintiff's police powers and temporarily seize his police equipment after Plaintiff suffered a head injury in 2019.

Plaintiff claims that the internal complaint Murphy submitted in 2017 alleging fraud, waste, and abuse by Plaintiff was retaliation for Plaintiff's 2015 internal complaint against Murphy and Uhrig. Murphy was not Plaintiff's supervisor at the time he submitted his complaint in 2017, and he was not acting as an agent on behalf of, or decisionmaker for, MNCPPC. Therefore, Murphy's complaint does not constitute a materially adverse action by Plaintiff's employer and is not actionable in a claim for Title VII retaliation against MNCPPC.

Next, Plaintiff claims that the investigations into his alleged misconduct were undertaken in retaliation for his 2015 internal complaint. Even assuming that these investigations were materially adverse, Plaintiff fails to establish the requisite causal connection. The investigations into Plaintiff's conduct did not begin until sometime in 2017, nearly two years after Plaintiff's 2015 internal complaint and a year after the investigation of that complaint was completed. This sequence of events is inadequate to make a *prima facie* showing of a causal connection. *See Constantine*, 411 F.3d at 501 (A "lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse ... action" often "negates any inference that a causal connection exists between the two."). Plaintiff fails to identify any admissible evidence to support a reasonable inference that MNCPPC's role in the investigations of Plaintiff were motivated by a retaliatory animus.

Finally, Plaintiff points to the "medical suspension" of his police powers in 2019, a decision made by McSwain, as a retaliatory action. This action was also too distant in time from Plaintiff's 2015 internal complaint to make a *prima facie* showing of a causal connection. Again, Plaintiff fails to cite any other admissible evidence that McSwain bore

58

any retaliatory animus against Plaintiff based on the 2015 internal complaint, an event that preceded by several years McSwain's hiring by MNCPPC. McSwain's decision was far closer in time to Plaintiff's EEOC complaint, but there is no genuine dispute that McSwain was unaware of the EEOC complaint at the time he ordered Plaintiff's medical suspension. If McSwain had no knowledge of Plaintiff's protected activity, then he could not have decided to suspend Plaintiff's police powers in retaliation for it.

In sum, Plaintiff fails to make a *prima facie* showing of Title VII retaliation,[35] and MNCPPC is entitled to summary judgment on this claim.

E.  Substantive Due Process: Counts VI and XI

Plaintiff asserts claims for due process violations against Individual Defendants under 42 U.S.C § 1983 (Count VI) and against all Defendants under Articles 24 and 26 of the Maryland Declaration of Rights against all Defendants (Count XI). "The First

---

[35]    Even if Plaintiff presented sufficient evidence to establish a *prima facie* case of retaliation, MNCPPC would still be entitled to summary judgment because it has produced legitimate, non-retaliatory reasons for its decisions to authorize investigations into Plaintiff's alleged fraud, waste, and abuse in 2017, and to suspend his police powers following his head injury in 2019. *See Navy Fed. Credit Union*, 424 F.3d at 407 (if plaintiff "establish[es] a *prima facie* case of retaliation, the burden shifts to the [employer] to articulate a legitimate, non-retaliatory reason for the adverse employment action"). Specifically, the investigations of Plaintiff were justified by multiple ultimately reports that he committed timekeeping errors and misappropriated MNCPPC property. The legitimacy of these reasons is bolstered by the fact that the investigations yielded findings that Plaintiff had engaged in some of the conduct that he was accused of engaging in. As to the suspension of Plaintiff's police powers in 2019 and temporary seizure his work equipment, McSwain testified that he made this decision based upon a letter from Plaintiff's physician stating that Plaintiff suffered a concussion, a traumatic brain injury. What information McSwain received raised legitimate concerns about Plaintiff's ability to function in his law enforcement role while recovering from his injury.

Upon Defendants' showing of non-retaliatory reasons for their actions, the burden shifts to Plaintiff to present sufficient evidence for a jury to conclude that Defendants' non-retaliatory explanations are merely pretextual and not its true reason for MNCPPC's actions, and that its true motivation was retaliation for Plaintiff's protected activity. *See Foster*, 787 F.3d at 250; *Westmoreland*, 924 F.3d at 726; *Navy Fed. Credit Union*, 424 F.3d at 407. Plaintiff has failed to cite any evidence to suggest that MNCPPC's non-retaliatory reasons for its actions were mere pretexts for retaliation.

Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and other provisions of the Federal Constitution afford protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." *Collins v. City of Harker Heights*, 503 U.S. 115, 119–20 (1992). "Both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights[] protect interests in life, liberty and property from deprivation or infringement by [the] government without appropriate procedural safeguards." *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 508–09, 709 A.2d 142, 146 (1998). Maryland courts have interpreted Article 24 *in pari materia* with the Due Process Clause. *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 971 A.2d 975, 982 (Md. 2009). Similarly, both the Fourth Amendment and Article 26 of the Maryland Declaration of Rights restrict governmental searches and seizures, and Maryland courts have interpreted Article 26 *in pari materia* with the Fourth Amendment. *Fitzgerald v. State*, 384 Md. 484, 506, 864 A.2d 1006, 1019 (2004).

With respect to executive acts, "the Due Process Clause was intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Substantive due process prevents "government officials from abusing their power" with conduct that is "arbitrary" or "shocks the conscience." *Id.* at 846-47.

In cases challenging executive action, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 849. n.8. "The shocks-the-conscience test turns on degree of fault. For a due process challenge to executive action to succeed,

the general rule is that the action must have been 'intended to injure in some way unjustifiable by any government interest.'" *Waybright v. Frederick* County, 528 F.3d 199, 205 (4th Cir. 2008). In the context of a voluntary employment relationship, the employee plaintiff must show that the governmental employer defendant "intended to harm" its employee in order to "establish a substantive due process violation." *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 322 (4th Cir. 2012).

Courts must exercise "self-restraint" and "utmost care," to carefully scrutinize the circumstances "before any abuse of power is condemned as conscience shocking." *Waybright*, 528 F.3d at 205 (internal quotation marks and citations omitted). "Conduct that shocks the conscience encompasses 'only the most egregious official conduct.'" *Slaughter*, 682 F.3d at 321 (quoting *Lewis*, 523 U.S. at 846). Viable substantive due process claims "typically feature quite extreme governmental wrongdoing." *Waybight*, 528 F.3d at 208; *compare Rochin v. California*, 342 U.S. 165 (1952) (pumping a suspect's stomach to look for drugs violated substantive due process), *with Doe v. Gooden*, 214 F.3d 952, 954–55 (8th Cir. 2000) (declining to find a substantive due process violation where a teacher allegedly engaged in verbal abuse of elementary school students because "[v]erbal abuse is normally not a constitutional violation").

If the challenged governmental action is not "so egregious" that it can be fairly said "to shock the contemporary conscience[,]" then "the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest." *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (quoting *Lewis*, 523 U.S. at 847 n.8). If, on the other hand, the challenged conduct satisfies the threshold test, "inquiry must turn to the nature of the asserted interest, hence to the level of protection to which it is entitled." *Id.*

Here, Plaintiff fails to offer sufficient evidence to meet the threshold test of shocking the contemporary conscience.

Plaintiff challenges MNCPPC's investigations of Plaintiff's alleged workplace misconduct in 2017 and 2018, Individual Defendants' participation in that effort, and the suspension of Plaintiff's police powers and access to police equipment in 2019 after he suffered a head injury. As explained in Part IV.D *supra*, there were legitimate reasons for each of the foregoing actions. The investigations of Plaintiff were supported by credible information indicating violations of policy and fraud, waste, and abuse by Plaintiff, and the suspension of Plaintiff's police powers was a temporary measure based on information from a physician that called Plaintiff's ability to function into question. No rational fact-finder could find any of the foregoing conduct egregious or outrageous.

Next, Plaintiff challenges MNCPPC's failure to impose "effective or meaningful discipline" against Uhrig and Murphy, to stop continued harassment of Plaintiff by Uhrig and Murphy, to change policies and procedures to address racial discrimination Plaintiff endured. (ECF 129-1 at 53–56). However, the evidence makes plain that Plaintiff's 2015 internal complaint against Uhrig and Murphy were thoroughly investigated. Uhrig and Murphy were removed from Plaintiff's chain of command soon after Plaintiff submitted his complaint and remained outside Plaintiff's chain of command. The investigation resulted in findings of violations by Uhrig but no allegations that Uhrig mistreated Plaintiff based on his race were sustained. Uhrig was suspended while the investigation was pending. Although Murphy's supervisor was prepared to suspend him based on sustained allegations of misconduct from the investigation, Murphy was eventually exonerated of any wrongdoing at his Hearing Board. When Plaintiff's complaints about Murphy

continued, apparently based on nothing more than Murphy's presence in the workplace and at meetings, McSwain created an entire new branch and assigned Murphy to that branch to minimize contacts between Plaintiff and Murphy. None of the foregoing actions by MNCPPC, Uhrig, or Murphy shock the conscience.

Other actions that Plaintiff challenges as violative of his due process rights include the "unreasonable scrutiny" to which Uhrig and Murphy subjected Plaintiff while he was under their supervision, as well as their denials of his requests for equipment and training and Murphy's negative exit evaluation of Plaintiff's work performance. All of this conduct occurred before September 11, 2016, and therefore any Section 1983 claim based upon it is time barred. (*See* ECF 45 at 9, applying three-year statute of limitations to Section 1983 claim). However, even if this conduct did not precede the applicable limitations period, none of it was sufficiently egregious to shock the contemporary conscience.

In sum, there is no evidence that any Defendant in this case committed any act "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hawkins*, 195 F.3d at 738 (quoting *Lewis*, 523 U.S. at 847 n.8). Therefore, Defendants are entitled to summary judgment on Plaintiff's due process claims in Counts VI and XI.

    F.   Negligent Training, Retention, and Supervision: Count XIII

In Count XIII, Plaintiff lodges a tort claim against MNCPPC for negligent training, retention, and supervision. "At common law, an employer owed its employees, *inter alia,* the following duties: 'to provide a safe workplace; ... to provide a sufficient number of competent fellow employees; and ... to promulgate and enforce rules governing employee conduct for the purpose of enhancing safety.'" *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 750 (D. Md. 1996) (quoting Prosser & Keeton

on Torts § 80 at 569 (W. Keeton ed. 1984)). "In part, these duties translated into an employer's duty to its employees to exercise due care in the hiring, supervision and retention of its employees and agents." *Id.* (citing Maryland cases). A claim for negligent training, retention, and supervision under Maryland law requires proof of the following:

> (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in [retaining, training, or supervising the employee] ... as the [proximate] cause of plaintiff's injuries.

*Karn v. PTS of Am., LLC*, 590 F. Supp. 3d 780, 805 (D. Md. 2022) (quoting *Jarvis v. Securitas Sec. Servs. USA, Inc.*, No. 11-CV-00654-AW, 2012 WL 527597, at *5 (D. Md. Feb. 16, 2012), *aff'd sub nom. Jarvis v. Contractor Securitas Sec.*, 474 F. App'x 271 (4th Cir. 2012)) (citing Maryland cases). Maryland's three-year statute of limitations for civil actions applies to all negligence claims. Md. Code Ann., Cts. & Jud. Proc. §5-101; (ECF 45 at 8–9). This suit was filed on September 11, 2019; therefore, any negligence claims based on acts alleged to have occurred before September 11, 2016, are time-barred.

Plaintiff bases his negligence claim against MNCPPC on its awareness that Uhrig and Murphy were incompetent based upon findings of misconduct in Skaife's report in March 2016; awareness of "racial tensions, hostile work environment, and racial disparities that ran rampant through MNCPPC"; and the agency's failure to take corrective action. (ECF 129-1 at 65). However, Plaintiff fails to identify evidence of anything "incompetent" or racially discriminatory that Uhrig and Murphy did after the release of Skaife's report that proximately caused Plaintiff any injuries. As noted above, Skaife's report did not result in any sustained findings that either Uhrig or Murphy mistreated Plaintiff based on his race.

Even if MNCPPC's response to Skaife's report was inadequate, and there is no evidence that it was, the only evidence of conduct by Uhrig and Murphy directed toward Plaintiff that followed release of Skaife's report were discussions between the two about Plaintiff's potential timekeeping violations; Murphy's internal complaint in 2017 alleging fraud, waste, and abuse by Plaintiff and other officers; and information Murphy later provided in connection with the OIG investigation of Plaintiff. There is nothing "incompetent" or tortious about any of this conduct, and there is no evidence that Murphy racially discriminated against Plaintiff in providing information about his alleged violations of departmental policy in 2017 and 2018. Moreover, there is no legally cognizable causal connection between the foregoing acts by Uhrig and Murphy and any injuries Plaintiff claims he suffered as a result of the investigations of his conduct, and Plaintiff fails to cite any legal authority to support finding proximate causation in this context.

Furthermore, after it received the HRX report noting interpersonal tensions and an unhealthy workplace culture in the Montgomery County Division, MNCPPC took action by providing multiple trainings to staff.[36]

For these reasons, MNCPPC is entitled to summary judgment on Plaintiff's claim for negligent training, retention, and supervision.

G. Negligence and Gross Negligence under LGTCA: Counts XIV & XV

In Counts XIV and XV, Plaintiff asserts claims of negligence and gross negligence claims against Individual Defendants in their individual capacities and against MNCPPC

---

[36]    Notably, Plaintiff complained of having to attend one such training simply because Murphy was present.

as indemnor under LGTCA.[37] As with Count XIII, any negligence claims based on acts alleged to have occurred before September 11, 2016, are time-barred. Md. Code Ann., Cts. & Jud. Proc. §5-101; (ECF 45 at 8–9).

To succeed on a negligence claim in Maryland, a plaintiff must prove four well-established elements: (1) the defendant was under a duty to protect the plaintiff from injury; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury or loss; and (4) the loss or injury proximately resulted from the defendant's breach of the duty. *Wash. Metro. Area Transit Auth. v. Seymour*, 874 A.2d 973, 976 (Md. 2005). A legally recognized duty is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Eisel v. Bd. of Educ. of Montgomery Cty*., 597 A.2d 447, 452 (Md. 1991). "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another." *West Virginia Cent. & P. Ry. Co. v. Fuller*, 54 A. 669, 671 (Md. 1903). Under Maryland law, gross negligence is "'something more than simple negligence, and likely more akin to reckless conduct.'" *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007).

Plaintiff claims that Individual Defendants breached a duty they owed Plaintiff to provide him "a safe place to work." (ECF 129-1 at 71). He cites *Bailey v. Cent. Vermont Ry.*, which notes that "[a]t common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain." 319 U.S. 350, 352 (1943). Plaintiff acknowledges that "[t]he common law duty to provide a safe place to work originally addressed the concept of 'safe' in terms of physical safety." (ECF 140 at 71–72).

---

[37]     Defendants argue that Plaintiff's negligence claims in Counts XIV and XV are preempted by statute. (ECF 106-1 at 35–36). Judge Chuang rejected this argument in his ruling on Defendants' motion to dismiss. I need not revisit that ruling because Plaintiff's negligence claims fail on the merits.

But he claims that "modern society and public policy demands a higher standard than that set in the 1940s: a standard that includes mental and emotional wellbeing as well as physical wellbeing." *Id.* at 72. Plaintiff fails to provide any legal authority to support that assertion and fails to show that Individual Defendants, in their individual capacities, owed any duty to Plaintiff to ensure his "mental and emotional wellbeing."

Plaintiff suggests that the various acts of racial discrimination and retaliation he claims to have suffered while working in the Montgomery County Division constitute breaches of a legally cognizable duty. However, as explained in Parts IV.C and IV.D *supra*, there is insufficient evidence to support Plaintiff's allegations that he suffered any discrimination or retaliation that proximately caused him any injury during the limitations period.

Plaintiff's attempts to now plead new tort causes of action, such as defamation, in opposition to Defendants' motion for summary judgment are improper and do not raise a genuine dispute of material fact as to the claims stated in the Third Amended Complaint. (ECF 140 at 68).

Defendants are entitled to summary judgment on Plaintiff's claims for negligence and gross negligence.

## V.     <u>Conclusion</u>

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF 106) will be granted.

A separate Order follows.

<u>March 31, 2023</u>                                    _____/S/_____
Date                                                            Matthew J. Maddox
                                                                   United States Magistrate Judge